# THE CONSOLIDATED GAS ELECTRIC LIGHT AND POWER CO. *vs.* THE STATE OF MARYLAND, FOR THE USE OF MARY O. SMITH, WIDOW, AND HARRY E. SMITH, INFANT.

*Discretion of Trial Court in Cross-Examination of Witness—Evidence—Inferences Drawn by Witness from Facts—Preliminary Proof of Correctness of Photograph — Injury to Lineman by Contact with Electric Wire Where Insulation Had Been Cut—Evidence as to Replacing Insulation—Opinion of Witness as to Reason for Cutting Insulation—Custom of Linemen as to Use of Rubber Gloves—Evidence of Experiment as to Visibility of Defect in Wire—Evidence as to Financial Resources of Plaintiff Inadmissible in an Action for Negligence Causing Death—Non-Reversible Error of Trial Court—Question of Contributory Negligence for Jury—Sufficiency of Evidence of Electric Company's Negligence—Prayer as to Scintilla of Evidence.*

The trial Court has a large degree of discretion as to allowing, or refusing to allow, a witness to be asked on cross-examination questions which are not clearly connected with his testimony on direct examination, especially when the questions

relate to matters which can be proved by other witnesses, or
by that witness himself if called by the cross-examining party.

In an action for an injury caused by a defectively insulated
electric wire, witnesses cannot be asked to state their infer-
ences, based on facts proved, as to the knowledge possessed by
the injured party as to the danger of such wires.

Photographs of the place where the accident happened which is
the cause of action are admissible in evidence when shown to
be correct representations, but the testimony of the photog-
rapher himself is not necessary. The preliminary evidence
as to the correctness of the photographs is addressed to the
discretion of the trial Court and from its determination in
the premises no appeal lies unless there be a plain abuse of
the discretion.

Plaintiff's deceased while at work on a telegraph pole was killed
by contact with an electric wire of the defendant company
from which the insulation had been removed. It was shown
that the insulation had not been worn off by time or exposure,
but had been clearly cut on that and adjacent wires, and also
that electric companies test their high current wires from
time to time, and that in so doing it is necessary to bare the
wire at the point of testing. *Held,* that evidence is admissible
to show that the wire with which the deceased came in con-
tact and the adjacent wires were re-covered or re-taped by
the defendant after the accident. Such evidence is not in con-
flict with the rule excluding evidence of repairs made after
the happening of the injury.

If persons engaged in a particular business habitually act in a
certain way without injurious results, that is evidence to show
that one who acted in that way at the time of suffering an
injury was not negligent. Consequently, in an action to re-
cover damages for the death of a lineman of a telegraph
company caused by his touching the defectively insulated
wire of an electric company, strung on the same pole as the
wires of the telegraph company, evidence is admissible to
show that it was not customary for the linemen of the tele-
graph company to wear rubber gloves while stringing wires
on poles, except in rainy weather.

When it is shown that plaintiff's deceased was killed by contact
with an electric light wire at a point where the insulation had

been sharply cut away, the foreman of a telegraph company, of many years' experience, may testify that, in his opinion, the wire had been cut for the purpose of locating trouble and testing.

A telegraph lineman, while at work on a pole, was killed by touching the uninsulated wire of an electric company strung on the pole. A witness who placed himself in the exact position of the lineman at the time of receiving the shock, testified that from that position, the deceased could not have seen the bare place on the electric wire, because certain heavy gauge wires were between the line of vision and the electric wire. *Held,* that this evidence is admissible, being the result of an experiment to ascertain as a fact, and not as an opinion, whether the range of vision of the deceased was obstructed or not.

In an action by the widow and infant child of a man to recover damages for the defendant's negligence which caused his death, evidence is not admissible to show that the plaintiffs have no property or means of support. When such evidence has been improperly admitted, but it is apparent from a comparison of the amount of the verdict and the amount earned by the deceased in his lifetime, that the defendant was not injured by the admission of such evidence, it is not reversible error.

In an action against an electric company for an injury caused by its defective wire which was strung on the same pole with the wires of a telegraph company, when there is no evidence that the telegraph company could be held liable as a joint wrongdoer, the plaintiff cannot be asked on cross-examination if she had not made a bargain with the telegraph company to sue only the electric company. Such a question is only calculated to mislead the jury as to the issue in the case, which is negligence *vel non* of the defendant.

When a witness for the defendant has testified that the insulation on a wire was in good condition two weeks before the injury was caused, evidence is admissible in rebuttal to show that shortly before the time referred to by this witness the insulation of the wire was broken off.

A lineman of a telegraph company while at work stringing a wire on a pole, used also by an electric company, was killed

by contact with a defectively insulated electric wire. In an action to recover damages for his death, the questions whether he was guilty of contributory negligence in not seeing the defect in the insulation, or in not using rubber gloves, or in his manner of work, are properly left to the jury where there is no evidence that the bare place on the wire could have been seen from the ground, and there is evidence that it could not have been seen from his position after climbing to his place of work on the pole, and evidence that under the conditions existing at the time of the accident, it was not customary for telegraph linemen to wear rubber gloves, and also evidence that the method used by the deceased to string the wire was the one usually employed for that purpose.

If it be shown that the insulation on defendant's electric wire was cut away at the point where the injury was caused, and that such condition existed two weeks before the happening of the injury, that is legally sufficient evidence of defendant's negligence to go to the jury, for if the cutting was not done by the defendant for the purpose of testing the wire, but by third parties, the lapse of time was sufficient to give constructive notice to the defendant of the condition of the wire.

When the evidence of defendant's negligence is sufficient to be submitted to the finding of the jury, it is not proper to instruct them that a mere scintilla of evidence to show defendant's failure to use due care is not sufficient to justify a verdict for the plaintiff. The Court cannot submit the case to the jury unless there is more than a scintilla of such evidence, and consequently, when the case is submitted, it cannot tell the jury to find for the defendant if there is only a scintilla.

*Decided January 13th, 1909.*

Appeal from the Baltimore City Court (SHARP, J.).

*Plaintiff's 1st Prayer.*—If the jury find from the evidence that the defendant Company owned and maintained a certain insulated wire carrying electrical current of high voltage which said wire was fastened to and supported by a cross-arm of a certain pole located in the bed of Guilford Ave.,

north of Eager Street, in the City of Baltimore and if the jury further find that the said pole was jointly used by the defendant and by the Western Union Telegraph Company; and if the jury further find that Harry H. Smith, the husband of the equitable plaintiff, was employed by the said Western Union Telegraph Company as a telegraph lineman and that in the course of his duties in such employment it became necessary for him to ascend the said telegraph pole, and to come into close proximity or contact with the said wire owned by the Defendant; and if the jury further find that the insulation on the said wire, at the time of the happening of the events which are the subject of this suit, was defective, because of the negligence of the defendant, so as to make the said wire a source of danger to persons coming into close proximity or contact with the same; and if the jury further find that whiile the said Harry H. Smith was so engaged in his duties and exercising such reasonable care as might be expected of a reasonably prudent man under the circumstances, he came into contact with said wire and received the injuries from which he died then the verdict of the jury should be for the plaintiff. (*Granted.*)

*Plaintiff's 2nd Prayer.*—If the jury find from the evidence that the defendant Company owned and maintained a certain insulated wire carrying electrical current of high voltage which said wire was fastened to and supported by a cross-arm of a certain pole located in the bed of Guilford Ave., north of Eager Street, in the City of Baltimore and if the jury further find that the said pole was jointly used by the defendant and by the Western Union Telegraph Company; and if the jury further find that Harry H. Smith, the husband of the equitable plaintiff, was employed by the said Western Union Telegraph Company as a telegraph lineman and that in the course of his duties in such employment it became necessary for him to ascend the said telegraph pole, and come into close proximity or contact with the said wire owned by the defendant; and if the jury further find that the said defendant had, prior to the time of the happening

of the events which are the subject of this suit, caused certain cuts to be made in the insulation of said wire at or near the point where the same was fastened to said cross-arm of said pole for the purpose of making tests or for some other purpose, and that said defendant had negligently allowed the said cut places in said insulation to remain bare and uncovered so as to make the said wire a source of danger to persons coming into close proximity or contact with said bare and uncovered portions thereof; and if the jury further find that while the said Harry H. Smith was so engaged in his duties and exercising such reasonable care as might be expected of a reasonably prudent man under the circumstances, he came into contact with said bare and uncovered portions of said wire and received the injuries from which he died, then the verdict of the jury should be for the Plaintiff. (*Granted.*)

*Plaintiff's 3rd Prayer.*—If the jury find from the evidence that the defendant Company owned and maintained a certain insulated wire carrying electrical current of high voltage which said wire was fastened to and supported by a cross-arm of a certain pole located in the bed of Guilford Ave., north of Eager Street, in the City of Baltimore and if the jury further find that the said pole was jointly used by the defendant and by the Western Union Telegraph Company; and if the jury further find that Harry H. Smith, the husband of the equitable plaintiff, was employed by the said Western Union Telegraph Company as a telegraph lineman and that in the course of his duties in such employment it became necessary for him to ascend the said telegraph pole, and to come into close proximity or contact with the said wire owned by the defendant; and if the jury further find that the insulation on the said wire, at the time of the happening of the events which are the subject of this suit, was defective, so as to make this said wire a source of danger to persons coming into close proximity or contact with the same; and that the defendant knew, or by the exercise of due care ought to have known of such defect; and if the jury further find that while the said Harry H. Smith was so engaged in

his duties and exercising such reasonable care as might be expected of a reasonably prudent man under the circumstances, he came into contact with said wire and received the injuries from which he died, then the verdict of the jury should be for the plaintiff. (*Granted.*)

*Plaintiff's 4th Prayer.*—The Court instructs the jury that if they find for the plaintiffs, then in assessing the damages they are to estimate the reasonable probability of the life of the deceased, Harry H. Smith, and give his widow, Mary O. Smith, and his child, Harry E. Smith, the equitable plaintiffs, such pecuniary damages not only for past losses but for such prospective damages as the jury may find that they have suffered or will suffer as a direct consequence of the death of said Harry H. Smith, and in estimating the pecuniary loss or prospective damages sustained by the widow they are to take into consideration her age and health and the probable duration of her life, and in estimating the pecuniary loss or prospective damages sustained by the said child, the jury are to take into consideration its age and condition in life and what it could have reasonably expected to have received from the deceased for its support and education up to the time of its attaining 21 years of age, the verdict to be apportioned between the said widow and child in such amounts as to the jury may seem right and proper. (*Granted.*)

*Defendant's 3rd Prayer.*—That as it appears from the uncontradicted evidence of the plaintiffs' own witness that the insulation on the wires of the defendant was not out of repair at the time of the accident, but had been cut off in some manner and by some person not shown by the evidence, and that there is no evidence to show that the defendant was responsible for, or connected in any way with, such cutting, or had actual or constructive notice thereof, therefore their verdict must be for the defendant. (*Refused.*)

*Defendant's 4th Prayer.*—That in estimating damages in this case they cannot allow anything for the pain and suffering which Harry H. Smith may have endured after his acci-

dent, nor for the grief and mental anguish of his wife occasioned by his death.  (*Granted.*)

*Defendant's 5th Prayer.*—The defendant prays the Court to instruct the jury that they cannot find for the plaintiffs in this case unless they find:—

1. That the deceased at the time of his accident was using due and ordinary care such as an ordinarily careful and prudent lineman would use under similar circumstances; and,

2. That the defendant was guilty of some act of negligence on its part which directly contributed to the happening of the accident resulting in his death.  (*Granted.*)

*Defendant's 6th Prayer.*—If the jury find from the evidence that the deceased, Harry H. Smith, by any failure to use due and ordinary care on his own part directly contributed to the happening of the accident which caused his death, then their verdict must be for the defendant, notwithstanding that they may find that the defendant was equally or even to a greater extent guilty of a failure to use due and ordinary care, and no matter how gross or culpable such failure on the part of the defendant may have been.  (*Granted.*)

*Defendant's 7th Prayer.*—The defendant prays the Court to instruct the jury that the burden of proof is on the plaintiff to show affirmatively that the death of Harry H. Smith resulted from some failure on the part of the defendant to use due and ordinary care, and that a mere scintilla of evidence of such failure is not sufficient to justify a verdict for the plaintiffs.  (*Refused.*)

*Defendant's 8th Prayer.*—The defendant prays the Court to instruct the jury that there is no evidence legally sufficient to show that the insulation on the wire where the accident occurred had been cut by the defendant or its agents or servants.  (*Refused.*)

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE, THOMAS and WORTHINGTON, JJ.

*Vernon Cook* and *Charles Markell, Jr.* (with whom were *Gans & Haman* on the brief), for the appellant.

*Joseph N. Ulman* (with whom were *Harman, Knapp & Tucker* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This suit was brought by the State for the use of Mary O. Smith, widow, and Harry E. Smith, infant son of Harry H. Smith, deceased, against the Consolidated Gas Electric Light and Power Company to recover damages for the death of said Harry H. Smith, caused by the alleged negligence of the defendant. There was a verdict for $4,800, of which there was apportioned by the jury to the widow the sum of $2,300, and to the infant child $2,500, and from the judgment on this verdict the defendant has appealed.

There are thirty-eight exceptions, the last being to the ruling on a motion to strike out certain evidence admitted subject to exception, and upon the prayers, and all the others being to rulings on the admission of evidence.

The deceased was a lineman of the Western Union Telegraph Company, and came to his death on May 8th, 1907, while engaged in his work as such lineman, by reason of his hand coming in contact with an electric light wire of the defendant company, carrying a current of 2,200 or 2,300 volts, supported upon a cross-arm belonging to the defendant company and maintained upon a pole of the Western Union Telegraph Company.

At the point where Smith's hand came in contact with this wire the insulation had been cut away by someone unknown, for the space of an inch, or an inch and a half, close to the cross-arm. The pole in question was a cable pole. At its top were seven double arms of the Telegraph Company carrying about sixty of its wires. The cable box was below these seven arms, and below these seven arms was a platform about twenty feet from the street, supported by two iron braces or angle irons bolted to the pole. About six feet below the

lowest Western Union arm was the cross-arm of the defendant carrying its wires, and below that was another cross-arm belonging to the United Railways and Electric Company.

On the day of the accident, Smith, in company with Eyler and Uhler, two other linemen of the Telegraph Company, were engaged in stringing an insulated but uncharged wire from this cable pole on Guilford Avenue between Eager and Chase Streets to the Belvedere Hotel. Smith took a hand line to which was attached the wire to be strung, and with the rope in his hand he climbed the pole, Eyler being on the next pole south, and Uhler being on the elevated railroad-structure in the street at that point. Eyler described the situation as follows: "Smith went up to the angle irons under the platform * * * The angle irons he was against were on the opposite side of the pole from that shown in the photograph offered in evidence * * * I was there when it was taken. The photograph now handed to me is the photograph that was taken when I was present. He went up as high as the platform; then he went to pass the rope he had taken up; he got his right foot down in the angle iron on the east side of the pole, and had his left foot on the west angle iron, with his back leaning against the west angle iron, and taking the rope in his left hand, and holding on with his other hand, he threw the rope or twirled it over the wires, and tried to grab the end of it, but in throwing the rope his fingers came in contact with that bare spot, and I saw a flame at the point where his hand was in contact with the wire, and I called to Uhler: 'Harry is burning up.' " Eyler at once came down from his pole, ran to the pole on which Smith was hanging, and climbed it, and just as he was about to seize Smith's coat in the effort to release him, Smith fell to the ground insensible, and died an hour or two later. He was a young man about twenty-eight years of age, a powerful man, in excellent health, sober, industrious, and a competent lineman, of five years' experience, and receiving $65 a month from the Telegraph Company.

· It would be impossible, within any reasonable space, to examine all these exceptions separately, but they may be reduced to classes or groups without omitting anything essential to their proper consideration.

The first and third exceptions will be considered together. The plaintiffs' first witness, Wm. E. Dixon, testified that he was a ground man of the Telegraph Company, and was on the other side of the elevated structure; that Smith went to the pole to take the hand line and wire up, and he heard someone call out that a man was burning up; that he dropped the wire he was running off and ran towards the pole, and saw Smith fall. This was the whole substance of his testimony in chief, except his statement of the efforts to relieve Smith and of Smith's age, habits and health.

On cross-examination he said: "I didn't see what wire he came in contact with until after he had been killed. I looked at some of the wires, from the ground, after the accident, and I looked up." He was then asked, "Standing on the ground and looking up, what, if anything, did you observe as to the condition of the wires?" and plaintiffs' objection to this question was sustained. He was next asked, "When did you make this examination of the wires which you have just mentioned; how soon after the fall of Mr. Smith?" and this was also excluded on plaintiffs' objection on the ground in both exceptions that this was not proper cross-examination, as it referred to matters in no way connected with the direct examination. The evident purpose of these questions was to elicit from the witness, without making him a witness for the defendant, a statement that he saw *from the ground* that the insulation of these wires had been cut away near the pole. No inquiry had been made in his direct examination as to the condition of these wires, and no statement relating to the wires had been made by him in his testimony in chief. He knew nothing about the cause of the accident, or the circumstances attending it, except that he saw Smith fall. This is not like the case of *Duttera* v. *Babylon,* 83 Md. 546, cited in appellant's brief, where the witness,

after testifying to the drawing, execution and delivery of a single bill, was allowed to be asked on cross-examination, who was present at that time and what was said by the maker of the bill, because these things were details of the essence of the very transaction to which he testified in chief. The latest case in this Court in which this question has been considered is *Black* v. *Bank of Westminster,* 96 Md. 399, in which was approved the liberal rule laid down in *Jones on Evidence,* Sec. 821, also cited in appellant's brief, but the Court there said much must be left to the discretion of the presiding judge in the determination of this question, and adopted the language of Mr. Jones in the same section, "that unless a trial Court should so far overstep the bounds as to admit that in cross-examination which clearly has no connection with the direct testimony, an appellate Court would not be justified in reversing a judgment for such cause, especially where the cross-examination is upon facts competent to be proved under the issues in the case." This discretion should be, and is, the same, whether in permitting or refusing such cross-examination, and it is obvious that in this case, under the issues raised, the fact apparently sought to be proved in cross-examination, was capable of proof, if a fact, either by calling Dixon as a witness for defendant, or by other witnesses who had knowledge of the condition of the wires on this pole. The good sense of the rule thus announced by Mr. Jones, and approved by this Court, is apparent in this case from the fact that the defendant subsequently proved by W. T. Russell, superintendent of the distribution of the electrical part of defendant's business, that he went to this pole next morning, and that from the ground he could see that the insulation had been removed from these wires.

We discover no error in these rulings.

The next group of exceptions embraces the 3, 4, 11, 12, 13, 14, 15, 31, and 36 exceptions. These all arose upon questions, the object of which was to draw from the witnesses their *inferences* as to the extent of the knowledge that the deceased, as an experienced lineman, had, or ought to have

had, as to the danger of these wires.   One or two of these
exceptions will serve to illustrate all.   In the third, 'the
witness Dixon had said on cross-examination: "Of course he
(the deceased) was familiar in a general way with electric
wires."   He was then asked, "And he knew the danger of
wires with a high current, didn't he?" . In the fourteenth,
Eyler on cross-examination had said that he had examined
the insulation on the wire in question, and that it was only
weather-proof insulation, and not pure rubber covering, and
he was then asked: "Could not any lineman tell it by exam-
ination?"   In the thirty-sixth, Russell, a witness for defend-
ant, in his direct examination said it was dangerous to stand
on a dry pole and handle alternating current wires without
rubber gloves, and that he would fire any man who would do
so.  He was then asked, "Does not every experienced lineman
know of that danger?"   In all this group of exceptions the
witnesses were asked to express their *opinions* on the very
questions the jury were to decide in making up their verdict.
It is carrying the theory of expert testimony too far to hold
that they may express an *opinion* upon *every issue* arising in
a case involving the technical knowledge and experience of a
party to the cause.   In 17 *Cyc.* 152, 153, it is said that where
an inference as to a mental state rests merely in the opinion
or belief of the witness, without any other basis for such in-
ference, he cannot be permitted to testify to the existence
of such mental state, and the author of the article says, "This
is true of *knowledge, understanding,* and other mental states
of another person, or of what entered into his consciousness
by means of hearing, *vision* or other faculty."   In *Union Pac.
R. R. Co.* v. *O'Brien,* 161 U. S. 451, where the widow of a
locomotive engineer sued for damages sustained by his death
caused by frequent accumulations of sand upon the track de-
railing the train, another engineer familiar with the road was
asked whether the engineers of the road were aware of these
frequent accumulations and of the danger thereby created,
but the question was held inadmissible.   "The answer would
have been purely an inference based on facts previously

proved, and an inference which it was for the jury to draw from those facts." We find no error in these rulings.

The next group embraces the 5, 6, 7, 8, 9, 19, 22, 23, 24 and 25 exceptions. These all relate to the use of certain photographs of the cable pole in question which were admitted in evidence. It does not distinctly appear from the appellant's brief upon what ground these exceptions were taken, but the use of photographs "wherever it is important to describe a person, place, or thing, in a civil or criminal proceeding, for the purpose of explaining and applying the evidence" (*17 Cyc.*, 414) is so well established and so fully recognized in our own decisions, that we assume the objection must have been not generally to their use in the case, but rather to their method of introduction. It is a matter of course that "photographs must be shown by some extrinsic evidence to be correct representations of the place or subject as it existed at the time involved in the controversy." *17 Cyc., supra.* Perhaps the most usual method of verification is by the oath of the photographer himself, but this is obviously sometimes impossible, and to declare it the exclusive method when the photographer is living, would be to establish an unreasonable requirement. The authors of the article above quoted say, "The photograph, however, need not be verified by the oath of the photographer taking it; the foundation of its introduction may be laid by any one who testifies to its correctness as a representation or likeness." As to whether a photograph is sufficiently verified, or is practically instructive, the question is a preliminary question, for the Court, and while there is some diversity of authority as to whether the determination of the Court in this respect is open to review or not, we think the weight of authority is that this discretion is not the subject of exception unless it is plainly exercised in an arbitrary manner. It was so held in *Van Houten* v. *Moss,* 162 Mass, 414; in *Jameson* v. *Weld,* 93 Maine, 345, and in *Pritchard* v. *Austin,* 69 N. H. 367.

In the case before us, one of the two photographs admitted in evidence was shown by the witness, Eyler, to have been

taken in his presence and to be a correct representation of the pole and wires, and the other was admitted without objection by the defendant. In all such cases, if there is evidence of changes in the condition or surroundings of the object since the accident, this may lead to the exclusion of the photograph, and should do so, where the substantial identity of the conditions has not been preserved.

· In this case, there is no such evidence and we find no eror in these exceptions.

The next group embraces the 10, 17, 18, 20, 21 and 32 exceptions. These all arose upon objection to questions put by the plaintiffs to their witnesses about the re-taping of the bare places upon the wire with which Smith came in contact, and the adjacent wires of the defendant upon that crossarm, after the accident, the objections of the defendant in each instance being overruled. These objections were based upon the generally accepted principle that evidence of subsequent repairs or precautions is not admissible to show a negligent condition at the time of the accident, a principle which has been approved in this State. If that were the purpose of these questions, the objections would be well founded, but we think it is quite clear such was not their purpose nor effect. It was in evidence that the insulation of these wires had not worn off by lapse of time or exposure to weather, but had been cleanly cut in the same manner and for about the same space from the pole, on all these wires. This certainly tended to prove that the cutting was not done by a trespasser, but by some one acting under a definite purpose. There was also evidence that it is necessary for electric companies from time to time to test their high current wires, and that to do this it is necessary to bare the wire at the point of testing, and this tended to show that the cutting was done by the defendant for the purposes of testing. If so done, the defendant's agents in charge of these wires, were negligent in not replacing the insulation *immediately* upon completing the tests. This is not the case of an accident occurring without apparent negligence on the part of the defendant, and

where the plaintiff seeks to fix the charge of negligence by mere proof of subsequent repairs or precautions. This is precisely a case coming within the qualification of the general rule stated in *21 Amer. and Eng. Enc. of Law,* 2nd Edition, page 522, where it is said, "evidence of subsequent changes, though it may be in the way of repairs or additional precautions, is admissible when fairly tending to show the actual conditions existing at the time of the injuries." We are of opinion this evidence was properly admitted.

The sixteenth exception arose thus: It had been shown on cross-examination that the Telegraph Company furnished its linemen with rubber gloves, and that there was a pair in the gang Smith was working with, but he did not have them on at that time. Counsel for plaintiff then upon re-examination asked Eyler whether it was customary or general to use rubber gloves in doing such work. This was objected to, but the objection was overruled, and the witness answered, "not unless it was a very bad rainy day," and further testified that it was a perfectly clear, dry day when Smith was killed.

We unders'and that the question asked for the *general custom* in that line of work, in respect to the use of rubber gloves, not the special custom of the linemen of the Telegraph Company in Baltimore. The custom of the party injured, or even of the particular force of which he was a member, cannot be made the criterion of negligence. *Such* a custom may be a negligent custom, and the issue in accident cases of this character always is whether the particular conduct complained of was negligent. But there seems to be a distinction in this respect between the *general* custom prevailing in a calling, occupation, or trade, and the custom prevailing in a particular organization, or locality. In *7 Amer. and Eng. Enc. of Law,* 378, it is said: "The only test by which it can be determined whether ordinary care has been used or omitted in any particular case is the test of negligence in general, which may be formulated thus: There has been no want of ordinary care, when, under all the circumstances and surroundings of the case, the person injured, or those whose neg-

ligence is imputable to him, did or omitted nothing which an ordinarily careful and prudent person would not have done or omitted." And in 21 *Amer. and Eng. Enc. of Law,* 524, it is said, "if the act or omission was pursuant to a known custom or usage observed by persons engaged in the particular business, without injurious results, it is proper to consider this circumstance in determining what the person should have foreseen." The principle thus enunciated commends itself as rational and sound. It can scracely be doubted that if it had been asked whether it was customary or general with ordinarily careful and prudent linemen to use rubber gloves in doing such work, that the question would have been a proper one. As framed however, the question had in fact a wider scope, and afforded a better test of due care to the jury, referring as it did to the general custom of all men engaged in that character of work. We therefore hold there was no error in this ruling.

The twenty-sixth and twenty-seventh exceptions relate to the testimony about the testing of these wires and the purposes for which the insulation was removed. Mr. Edmondson was the general foreman of the Telegraph Company and had held such positions for about thirty years. He erected the pole in question, was familiar with it in May, 1907, and inspected it the day of the accident. He described the manner in which the insulation was cut away at that time, and said it looked as if it had been cut with a knife. He was then asked what he knew about testing wires in Baltimore City, and the objection being overruled he said he knew tes's were necessary for the location of trouble, and that the only effective way was to skin the insulation off, but that it is not necessary to leave the wire bare longer than when the test is made. He was then asked "what appeared to be the purpose for which they had been skinned?" and he replied, "testing, I judge for no reason but testing, and this was a very convenient pole for that purpose; it was stepped and there was a platform there;  *  *  *  and the manner in which it had been done showed that it was done for testing purposes."

This witness was shown to be an expert in his line of long experience, and it is difficult to perceive any ground for the 26th exception.

The twenty-seventh exception however requires careful consideration. The subject of the limits of expert testimony is a vexed one, and the tendency of well considered cases in recent years is to restrict its admission. In the recent case of *Belt. R. R.* v. *Sadtler,* 100 Md. 334, this Court said: "It is not desirable to enlarge the limits within which expert testimony is admissible, and whenever the ultimate fact desired to be proved, is from the nature of the issue, especially confided to the jury, it should be rigidly excluded." This language was carefully chosen by the learned judge who delivered the opinion, with regard to the particular question in that case, viz, whether expert testimony was admissible to prove the exact amount of damage sustained by a plaintiff by reason of smoke, cinders, gases and vibration resulting from the operation of a railroad in a tunnel adjacent to the plaintiff's property. In *Stumore* v. *Shaw,* 68 Md. 19, JUDGE MILLER said: "There is a general concurrence of authority and decisions in support of the proposition that expert testimony is not admissible upon a question which the Court or jury can themselves decide upon the facts; or, stated in other words, if the relation of facts and their probable results can be determined *without special skill or study,* the facts themselves must be given in evidence and the conclusions or inferences must be drawn by the jury." This language, we think, gives the true solution of the question before us, without in the least impairing the value of the utterance in *Belt R. R.* v. *Sadtler, supra.* We think, upon reflection, it must be obvious that no ordinary jury possesses the special skill or knowledge which would enable it to determine, from the mere fact that the insulation of these wires was cut away, by whom and for what purpose this was done. *Their* verdict, unaided by testimony from those whose special training and skill qualified them to judge, could only be speculation. Edmondson, however, brought to that question thirty

years of special training and · observation.   He found this
pole fitted especially for testing purposes, with iron steps and
a platform; he found that all the cuts were made in the same
manner with a sharp instrument, and that these cuts were
located just where they would be located if made for the pur-
pose of a test.   All this would be Greek to the average jury-
man, but plain English to an expert in Edmondson's busi-
ness.   Aided by his testimony, they could intelligently con-
sider that question.   Without, they, must either ignore it or
resort to pure speculation.   The case of *Galveston R. W. Co.*
v. *Briggs,* 30 S. W. 933, illustrates this view, where an ex-
pert witness was permitted to testify from the appearance of
certain dents in the woodwork of a car that he could say they
were caused by one drawhead slipping over another.   More-
over, if these cuts were not made for the purpose of testing,
it was an easy matter for the defendant to show this by its
agents in charge of their wires, and this is a consideration
which cannot properly be disregarded.   We find no error in
this ruling, and it follows there was no error in the refusal
to strike out this testimony, which motion constitutes a part
of the 38th exception.

The 28th, 29th and 30th exceptions will be considered to-
gether.   It had been testified by Eyler that Smith at the time
of the accident stood with one foot in each brace of the angle
and leaning against an angle iron.   Edmondson, it seems, had
put himself in that precise position, and plaintiffs' counsel
then asked him if Smith, in that position, could see the bare
places on the wire, to which the defendant objected, and the
objection being overruled, the witness replied that he was two
inches shorter than Smith, and that standing in the same
place his eyes were two inches below some heavy gauge wires,
"which I *judge* obscured his vision and he could not see the
place."   The next question was "And those wires, you say,
would obscure his vision?" to which he replied, "I judge they
would."   He was then further asked, "What would be the
effect of those wires upon the vision of a person?" and he

replied: "They would obscure it, *because they are directly between the man and the wire he came in contact with.*"

It will be seen that these questions are all founded upon an actual observation of the witness, while in the exact position occupied by Smith at the time of the accident, and that this observation was made in the course of an *experiment* to ascertain *as a fact, and not as an opinion,* just how far Smith's vision was obstructed by these heavy gauge wires directly between his eyes and the wire by which he was killed.

The answers to the twenty-eighth and twenty-ninth questions standing alone would be of doubtful admissibility, but the answer to the thirtieth is a statement of fact. This answer we think is within the rule approved in *Richardson* v. *State,* 90 Md. 119, as to proof of experiments made under precisely the same circumstances as at the time of the occurrence in question, and which rule was further approved in *Keyser* v. *State,* 95 Md. 96, and *Gambrill* v. *Schooley, idem,* 283. In the light of the answer in the thirtieth exception, the answers to the twenty-eighth and twenty-ninth become harmless error.

In the thirty-third exception, counsel for plaintiffs asked Mrs. Smith, the widow, "Have you any property or means of support?" To which she answered, after the defendant's objection had been overruled, "I have not."

We agree with the appellant that under Lord Campbell's Act "the measure of damages is the pecuniary loss sustained by the equitable plaintiff by reason of the death for which suit is brought, and that whether this widow have, or have not means of her own, she would equally be entitled to recover from the defendant the amount lost by her by being deprived of the support furnished by her husband." The admission of such testimony is therefore irrelevant, in any case, and must tend to prejudice one of the parties in any event. Proof of poverty of the plaintiff must prejudice the defendant by exciting the sympathy of the jury, and leading them "to substitute sympathy for justice, and to award charity instead of

compensation." Proof of ample means of support on the other hand might induce the jury to withhold just compensation, though misfortune might at any moment deprive the plaintiff of his own means of support. The prejudice to be apprehended in the admission of such evidence would naturally be most dangerous to defendants, but neither party should be subjected to such danger. Upon reason we could not hesitate to hold that such testimony ought not to be admitted, and it appears that the weight of authority is to that effort. The cases are collected in 13 *Cyc.*, 359. The ground for the rule we approve is well stated in *Greene* v. *So. Pac. R. Co.*, 122 Cal. 564-5, and in *Central R. Co.* v. *Moore*, 61 Geo. 151, and this is the view adopted in the Courts of Illinois, Iowa, Kentucky and by one of the Federal Courts in 144 Fed. Rep. 379.

But in the case before us the jury has, very clearly, successfully resisted the apprehended appeal to their sympathy, and have not permitted themselves to go beyond moderate compensation. The uncontradicted proof is that Smith was a young man about twenty-eight years of age, in perfect health, and earning $65 a month, or about $800 a year. The widow, in view of her husband's age, must have been a comparatively young woman, and the son was born after the father's death. The father's duration of life, calculated by any standard mortuary tables, would have covered the minority of the child, and the widow's expectation of life would have covered the same period at least. The total amount allowed the widow and child was $4,800. Assuming that this could have been permanently invested at six per cent. per annum, it would produce annually only about one-third of the annual earnings of the deceased, and that sum must be less than they would have received if he had lived, and is not adequate for their proper food and clothing and shelter. If the principal were drawn on to supply the deficiency of income, it would be exhausted by the time the child reached majority, or even before he reached the age of labor sufficient to sustain himself. We cannot therefore find any evidence

whatever that the verdict was influenced by the testimony admitted, and we would not be warranted in reversing the judgment for a technical error with no concurring injury.

The relevancy of the inquiry in the thirty-fourth exception, whether the witness Uhler as a lineman did not know that all the electric companies in Baltimore used each others poles, is not perceived, and it need not be specially noticed.

The thirty-fifth exception was not referred to in the appellant's brief nor so far as we can remember in its oral argument. Mrs. Smith testified in chief that she had never released the Telegraph Company from any claim for her husband's death, and on cross-examination she was asked if she had not made a bargain with that company to sue only the Electric Light Company and that it would send Edmondson its superintendent as her chief expert witness, and on plaintiffs' objection this question was excluded. If there had been any evidence whatever to show that the Telegraph Company could in any way be held liable as a joint wrong doer, this ruling might have been erroneous but there was not a shred of evidence to that effect, and the question was only calculated to mislead the jury as to the real issue, viz, the negligence of the defendant.

The thirty-seventh exception arose upon the evidence in rebuttal, but was not noticed either in the appellant's brief or argument. Slocum, the defendant's inspector, had just testified that he inspected this pole about two weeks before the accident, and that there were no breaks or cuts in the insulation of these wires. Uhler was then called in rebuttal, and was allowed to testify over defendant's objection, that about April 1st, he was upon that pole, and then saw the insulation was off in places, as when Smith was killed. This would seem therefore to be a plain case of proper rebuttal, and we come finally to the prayers.

The plaintiff offered four prayers all of which were granted and the defendant offered eight. Its fourth, fifth and sixth prayers were granted and its first, second, third, seventh and eighth were refused. Its first, second and third prayers were

demurrers to the evidence. The first asserted there was no
evidence legally sufficient to show any negligence on the part
of the defendant directly contributing to the accident which
caused the plaintiff's death.

The second asserted that it appeared by the uncontradicted
evidence in the case that the deceased's own negligence directly
contributed to his death; and the third asserted that it ap-
peared from the uncontradic'ed evidence of the plaintiffs'
witnesses that the insulation on the defendant's wires was
not out of repair at the time of the accident, but had been
cut by some person unknown, and that there is no evidence
to show that the defendant was responsible for or connected
in any way with such cutting, or had any actual or construc-
tive notice thereof.

It is apparent from what we have said in discussing the ex-
ceptions to the evidence that we think each of these prayers
was correctly refused.

Taking them up in the inverse order, if the evidence of
Edmondson was properly admitted there was evidence tend-
ing to show that the cutting of the insulation was done for
the testing of defendant's wires, for which cutting it would
be responsible, and even if not done by its employees for that
purpose, there was evidence given by Uhler, that the insula-
tion was cut two weeks before the accident, a lapse of time
ample to give constructive notice to the defendant of the con-
dition of these wires. This is applicable also to the first
prayer.

In reference to the second prayer Dixon testified that the
method employed by Smith to string the wire was the method
regularly employed, and Eyler when asked as an experienced
lineman if the safe and proper way to get the rope up would
not have been to go up higher and stand on the platform, re-
plied that "he would have done the same that Smith did." If
it be supposed that the prayer relied upon Smith's failure to
use rubber gloves, this view is met by the proof that it was
not usual or customary to use them except on very bad rainy
days, and that the accident occurred on a dry clear day. In

*Ziehm's Case,* 104 Md. 48, a very similar case, counsel for
the Electric Company contended "that it was a simple matter
of using the rubber gloves he carried, or not permitting his
bare hands to come in contact with the high potential wires,"
but the Court reversed the judgment in favor of the defend-
ant, holding the case was improperly withdrawn from the
jury. The case of *Gloucester Electric Co.* v. *Dover,* 153 Fed.
Rep. 139, is in point where a telephone lineman upon a pole
used in common by it, and an Electric Light Company was
injured by contact with a bare place on a high potential wire
of the latter. This bare place was within four inches of the
side of the pole, but was not seen by the man from the
ground. The pole swayed from some cause and his hand
came in contact with the bare wire. The defendant contended
that it was unquestionable negligence for a man familiar with
electric wires merely to look at the wires to ascertain their
condition, and then allow himself to be brought in contact
with them without the safety of a safe guard belt, and that
contributory negligence should be ruled as matter of law, but
it was held the question was properly one for the jury. So
in *Commonwealth Electric Co.* v. *Rose,* 214 Ill. 545, it was
sought to take the case from the jury, where a telephone line-
man was injured by an electric light wire, on the ground
1st, that under the facts of the case he should have known of
the defective insulation; 2nd, that he should have worn a
safety belt, and 3rd that he should have worn rubber gloves.
There was evidence that neither the belt nor gloves were abso-
lutely necessary at all times, and the Court held the question
of due care in the manner of doing his work was one for the
jury.

In the case before us there is evidence that in the position
Smith was, the heavy gauge wires were between his head and
the bare wires, and there was no evidence that he saw or could
have seen from the ground that the insulation had been re-
moved. What has been said in reference to these three pray-
ers of defendant applies also to the eighth prayer which was

correctly refused in view of the testimony of Edmondson as to the character of the cutting of the insulation.

The latter part of the defendant's seventh prayer renders it bad. In 6 *Enc. Pl. & Pr.*, 675, the Scintilla of Evidence rule is defined, as the rule applied, "whenever a party has produced a scintilla of evidence in his favor, because he is then entitled, in those jurisdictions where this rule prevails, to have his case submitted to the triers of fact." In conformity with this statement, this Court in *Savington's Case,* 71 Md. 599, says even a scintilla of evidence of negligence will not justify the Court in submitting the case to the jury." Whether there is only a scintilla of evidence is for the Court to say, and not for the jury, and where the Court so finds, its duty is to withdraw the case from the jury. It cannot submit the case to the jury because the Court finds there is *more than a scintilla,* and yet instruct that if they find there is *only a scintilla* they will not be justified in a verdict for plaintiff. *Clark* v. *Dederick,* 31 Md. 148, 150.

We are of opinion that the case was properly submitted to the jury upon the granted prayers of the plaintiffs and defendant, which we will request the reporter to set out, and finding no reversible error in any of the rulings, the judgment will be affirmed.

> *Judgment affirmed with costs to the appellee above and below.*