ARCHIE LEE PEARSON *v*. STATE OF MARYLAND

[No. 3, April Term, 1943.]

2

*Decided April 28, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*Harold C. Smith* and *Paul B. Mules* for the appellant.

*Robert E. Clapp, Jr., Assistant Attorney General,* with whom were *William C. Walsh, Attorney General,* and *Joseph V. Simpson, States Attorney for Montgomery County,* on the brief, for the appellee.

MELVIN, J., delivered the opinion of the Court.

The appellant, Archie Lee Pearson, was found guilty of rape by a jury in the Circuit Court for Montgomery County, and was sentenced to be hanged. He has appealed to this court for a reversal on the basis of six exceptions taken at the trial. Two of these, the first and fourth, were "abandoned," counsel for defendant stated, and reliance placed upon the remaining four. Of these, the third exception, relating to the location of a telephone bell in the home of a witness, Mary Offutt, is so clearly irrelevant and free from reversible error that the trial court's ruling on that point is affirmed without the necessity of further comment. The other three exceptions present the points upon which the present appeal hinges. These are the admissibility of the photograph mentioned in exception No. 2 and of testimony relating to the bank account and the earnings of the witness, Everett English, as mentioned in exceptions No. 5 and No. 6.

Before passing upon these exceptions it is to be noted that the record of facts before the court, and upon which its rulings must be based, is strikingly meagre, weak and inadequate in its presentation of a case involving the life or death of the defendant. On the issue of rape the alleged victim, Mrs. Everett English, claims that she was choked by the defendant and marks left upon her throat. The defendant denies that he laid hands upon her at all. Therefore, the physical appearance of the woman on the morning following the night of the alleged attack was relevant and important, and a photograph, properly verified, of her as of that time would have been clearly admissible in support of the testimony of any witness or witnesses who then saw her. Yet, notwithstand-

ing this obvious relevancy and importance, the photograph that was then taken was not even developed and there is no description in the record of any marks on her as of the Monday morning in question, although there were four eyewitnesses to her condition at that time, namely, her husband, and Rosie Jenkins, in whose home she took refuge, and who was the first person who saw here after the alleged attack, Officer Ralph Howard and Officer Earl Stearn.

The woman, herself, in her testimony in chief does not even mention any marks, and it is only when she was recalled in connection with a picture—supposedly the one taken four days later and referred to in the second exception—that she mentions them at all. Officer Stearn in his testimony "identified," but did not attempt to describe, "marks or scratches and bruises on her throat," and although he took a photograph of the same on Monday morning he did not develop it and it was not "available" at the trial. No explanation is given as to why it was not available. He further testified that he took another picture on the following Thursday, which was developed by the witness Jack Berry, and that it was a fair representation of how she looked on Thursday. This was different from her appearance on Monday in that the said marks were not colored on the former day, but had become colored by the latter.

Consequently, there is no testimony whatever in the record of the appearance of the alleged victim of the attack describing any marks or bruises as they may have appeared when she was at the Jenkins home the morning following her experience.

On the main issue the record is also lacking in any medical testimony as to the woman's physical condition or appearance following the alleged attack or any other time, thus leaving her version without support from the one source which is almost invariably found in a case of this character. There is still another important element in the case concerning which the record is

notably inadequate, and that is a description of the scene
or locale of the alleged attack. The record goes no fur-
ther than to mention crossroads, where the altercation
began, one of which roads went in the direction of the
Englishes' home and the other toward the defendant's;
"a dirt road that led by Mr. Clarence Offutt's house,"
and up which the woman says the defendant forced her
to go; a "field" which she said they crossed and a "pine
thicket" at which they finally arrived.

Just how far altogether it was from the place where
the automobile stopped, over the dirt road and across
the field to the pine thicket—whether a hundred yards
or a mile—is not even indicated in the record, nor any
detail or picture, oral or otherwise, given as to the terrain
or the route followed.

While these omissions from the record of relevant, im-
portant and customary features of testimony is con-
spicuous in this kind of a case, what the record does dis-
close in the way of essential facts is likewise surprisingly
meagre. The substance of the testimony of the prose-
cuting witness, Mrs. English, is that she and her hus-
band had made a Sunday evening visit to a tavern. Upon
leaving, she first saw the defendant when she came to
the side of the automobile, "an old mail truck," where
her husband was sitting. The defendant, whom they had
never met before, asked if he could ride with them toward
his home, and they agreed. The husband went back into
the tavern and purchased three bottles of beer (later
mentioned, without contradiction, as being quart bottles)
with money provided by the defendant. The truck was
stopped at the home of a Mrs. Dunnegan, friends of the
Englishes, and the husband and wife went in that
house for a stay of about thirty or forty-five minutes,
leaving the defendant in the truck. They then re-
sumed their journey homeward. Upon arriving at
the crossroads, which was their parting of ways, the
husband stopped the truck and told the defendant he
would have to get out and go home. Before that, from

the time of leaving Dunnegan's, the defendant "opened conversation about loaning her husband money, but that she would have to get out and take the money." Finally, "in order to quiet him," her husband took the $5. When the machine stopped at the crossroads and the defendant got out, he "started fighting and threw stones at her husband, who retreated up the road." Just why the latter, instead of retreating, did not remain in his truck and keep on going is not explained. As soon as her husband "retreated," the witness continued, "Pearson returned to the car, got into it and put his arm around her." Quoting from the record the rest of her story, which is in narrative form, is: "She opened the door, slid out the other side and Pearson immediately followed; then he choked her and threatened her life if she didn't keep quiet; he grabbed her by the arm and forced her to go up a dirt road leading by Mr. Clarence Offutt's house; after going across a field they finally arrived at a pine thicket; Pearson choked her once more in addition to the time shortly after getting out of the car; that in this pine thicket he forcibly and against her will ravished her; that after a considerable period of time, and after she begged and begged him to show her the way back to the road, that he had again ravished her some time before reaching the road; that when they came up to the road she looked for her pocketbook and then went up to a colored house occupied by Rosie Jenkins." When she stopped there she said her clothes "were badly shattered," that she was completely a "nervous wreck" and was "almost hysterical."

It is to be noted here that there is no corroboration by Rosie Jenkins, her first contact, of these particular points of testimony. She is silent as to Mrs. English's condition upon arrival and as to this goes no further than to testify that Mrs. English was wet and cold, that she had no stockings on, and that she didn't take off anything but her dress. Mrs. English stayed in this house

over night until about 8 o'clock next morning, when her husband and the officers arrived.

As to the husband, Everett English, the record shows that "he testified substantially in the same manner as his wife had done until the truck was stopped at the crossroads when Pearson got out; that upon getting out of the truck he offered Pearson back his $5.00 and told him he must go home; that an altercation resulted and he thought that Pearson was going to cut him, and that he could obtain help at the house a short distance by from the road in the direction that the truck had gone; before he reached the house a colored man, Dorsey caught up with him in an automobile, and he got Dorsey to turn the car around and go in search of his wife. When he got there he could not find her or Pearson, that he looked for them and finally went to several houses before getting a telephone to call the police; then he waited for the police to arrive and then scoured the country in search of his wife and Pearson, but was unable to locate either of them until 8 o'clock next morning, when he found his wife at Rosie Jenkins'; that at no time during the conversation with Pearson had he requested the loan of any money and he was in no need of money." That was all the testimony given by the husband, until recalled to the stand on behalf of the State to testify as to the state of his bank account and his earnings, which are the subject of the fourth and fifth exceptions.

The only other witness on behalf of the State whose testimony has any relevancy to the issues involved in this appeal are Officer Ralph Howard, who saw Mrs. English at the Jenkins home around 7 or 8 o'clock in the morning following the alleged attack; Officer Ralph Stearns, who was there also and who took the photograph on that Monday morning as well as the one on the following Thursday; and Jack Berry who developed the latter picture and who was the witness on the stand when the State attempted to offer it in evidence. It was

8

at this point that the objection to the offer was made and overruled, constituting the defendant's second bill of exceptions. As this is the first exception now open for consideration on this appeal, it will be taken up in order.

The record shows that the ground of the objection to the photograph is that "it was not taken, developed and printed by the same person." The law does not support this contention, however, for it is well settled that while the photographer is, of course, a proper person to identify or authenticate a photograph, it is not essential that the foundation be laid by him, but it is permissible for any one with knowledge of the facts to testify to its correctness as a representation or likeness. 23 *C. J. S., Criminal Law*, Sec. 852; *Consolidated Gas Co. v. State, to Use of Smith,* 109 Md. 186, 72 A. 651; *Neimoth v. State,* 160 Md. 544, 154 A. 66; *Kirsch v. Ford,* 170 Md. 90, 183 A. 240; *Commonwealth v. Lucitti,* 295 Pa. 190, 145 A. 85; *Lawson v. Darter,* 157 Va. 284, 160 S. E. 74; *Wigmore on Evidence,* 3rd Ed., Vol. III, 794; *Jones on Evidence in Civil Cases,* 4th Ed., Vol. 2, 1100.

Therefore, if the point specified by appellant in the record were the only ground of objection to the admissibility of the photograph, it would have to be overruled. However, it is not a case here of the authenticity or identification of this photograph, for that question is resolved in its favor. Standing alone, and thus verified, it would have been admissible, in the court's discretion, as a fair representation of the object photographed at that particular time. The point is that the same object —the woman's neck and throat—was also photographed on the preceding Monday, when its condition and appearance were immediately relevant. Monday's photograph, taken by Officer Stearn and verified by him in connection with the one he took four days later, would have given the jury a visual perception of what the witness saw and described on both occasions. That is what they were entitled to have if any photographs at all were

to be exhibited. *Wigmore on Evidence,* 3rd Ed., Vol. III, 792, 1943 Pocket Supplement; *Riss & Co. v. Anderson,* 108 Colo. 78, 114 P. 2d 278. However, to suppress the former, without any explanation whatever for so doing, and to show the latter to the jury, tended to defeat the very purpose of photographic testimony, which is to clarify the oral evidence. *State v. Goins,* 120 W. Va. 605, 199 S. E. 873; 23 *C. J. S., Criminal Law,* Sec. 852. It was this unexplained failure to produce the first picture that destroyed the foundation for admitting the second one, and clearly differentiates this case in theory from those cited by appellee.

As stated in *Wigmore on Evidence,* 3rd Ed., Vol. III, 792: "A photograph, like a map or diagram, is the witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words." Neither accuracy nor clarification could be promoted by communicating to the tribunal an oral expression of what the witness observed on the two occasions in question, while at the same time showing, in support, only a portion of the photographic evidence thereof at his command.

The law is also well established that before a photograph may be admitted in evidence it must have a testimonial sponsor—that is to say, it must first be made a part of some qualified person's testimony and in this way "verified." *Wigmore on Evidence,* 3rd Ed., Vol. III, 793. In the case at bar the witness offered by the State as sponsor was Officer Stearn, who saw Mrs. English on Monday and on Thursday and took photographs of her on both occasions. He testified that Thursday's photograph was a "fair representation of how she looked" then. The photograph was not offered at that point, but was offered through the next witness, Berry, who stated that he developed the picture "just testified to by Officer Stearn." The offer was made by the State while this witness (Berry) was on the stand, and to the court's overruling of the defendant's objection exception was

"then and there" taken, constituting the second bill of exceptions. Evidently recognizing the incompleteness of the State's foundation for the offer up to that point, the prosecuting witness, Mrs. English, was recalled to the stand on behalf of the State, at the suggestion of one member of the trial court. Then, without attempting to identify the particular photograph in question, so far as the record shows, she was questioned about "a picture" which was shown her, following which the State again offered in evidence "the picture" which was inferentially the same one that was offered when the witness Berry was on the stand. Objection was renewed and overruled, and exception taken, although no bill of exceptions on this point, other than the one previously noted, was added to the record.

By this procedure a change of testimonial sponsorship of the photograph was attempted—that is to say, a change from the photographer-developer combination who could verify it up to a certain point and through whom it was first offered, to the prosecuting witness, who was recalled to supply any omissions in the foundation for the offer by testifying as to the physical appearance of her own throat at the time Officer Stearn took the picture of it on the Thursday in question. To sanction any such procedure as this, especially in a case involving capital punishment, would be to give an interpretation to the rule of evidence regarding the admissibility of photographs that would defeat its purpose, which is clarification. *State v. Goins,* 120 W. Va. 605, 199 S. E. 873; 23 *C. J. S., Criminal Law,* Sec. 852.

As stated in appellee's brief, "the point herein raised by the appellant seems not to have been specifically decided in a criminal case, but it has been so decided in civil cases." Reference is then made to several Maryland cases on the theory that they support appellee's contention as to the admissibility of this particular photograph. The cases cited are: *Snowden v. State,* 133 Md. 624, 106 A. 5, which in turn cites *Consolidated Gas Co.*

*v. State, to Use of Smith,* 109 Md. 186, 72 A. 651; and *Wimpling v. State,* 171 Md. 362, 189 A. 248, 254.

In the last named case. which involves a charge of statutory arson, the admission of certain photographs purporting to represent the burned building after the fire was held to be error on the ground that there was no proof that they were a correct representation of the building at the time they were taken, and that there was no evidence identifying them with the different parts of the building they purported to portray. In that connection the court stated the law to be as follows: "Ordinarily the admissibility of photographs as evidence is within the discretion of the trial court, *Snibbe v. Robinson,* 151 Md. 658, 663, 135 A. 838, 50 *A. L. R.* 280; *Baltimore City v. State, for Use of Biggs,* 132 Md. 113, 117, 103 A. 426, but that rule is only applicable where the photographs are shown by competent extrinsic evidence to be true representations of the scene or object which they purport to represent at the time when the appearance of such scene or object is relevant to the inquiry in connection with which the photographs are offered, 22 *C. J.,* 921; *Baltimore City v. State, for Use of Biggs, supra; Western Maryland Ry. v. Martin,* 110 Md. 554, 73 A. 267; *Consolidated Gas, Electric Light & Power Co. v. State,* 109, Md. 186, 72 A. 651."

Therefore, the Wimpling case, *supra,* is not only no authority for admitting the second photograph taken by Officer Stearn in the case at bar, but could with more force be cited as authority to the contrary, in view of the immediate relevancy of the first photograph which, without any explanation, was not produced.

Appellee places special reliance on the case of *Snowden v. State,* 133 Md. 624, 106 A. 5, 8. However, there is a marked distinction between the facts and circumstances concerning the photographs offered in that case, which was an indictment for murder, and those concerning the photograph under consideration here. In the former case, during the examination of a doctor he was shown

and identified certain photographs which, he said, represented the marks and bruises on the body of the victim at the time he first saw it and at the time of the autopsy. These marks and bruises were fully described in his evidence and it was not denied that they existed. This court ruled that "as these photographs were merely representations of injuries which had been fully described by the witness, and not denied to exist, their introduction in evidence could not be held to have injured the accused."

In the case before us there is an express denial by the defendant that there were any marks or bruises at all resulting from his association with the prosecuting witness on the Sunday night in question. In other words, he denies the existence of any marks or bruises, so far as he was concerned. Therefore, when the witness Stearns was on the stand he could have described what he saw on the following Monday morning and then verified his observation by means of the photograph taken by him at that time. This would have been entirely revelant to the inquiry in connection with which the photograph could have been offered, thus bringing the offer within the ruling in the Snowden case and the other cases in line with it. However, that was not the procedure followed here. The jury was not given the witness Stearns' photographic testimony of what he observed on that Monday morning in support of his oral description from the stand, but the prosecuting witness, Mrs. English, was recalled for the purpose of giving her sponsorship to, or verification of, a second photograph taken four days later by the officer.

Taking into consideration all the facts and circumstances incident to the photographs in this case, it is clear that the one offered in evidence, and mentioned in appellant's second bill of exceptions, should have been excluded for the reasons stated.

The exceptions in the case remaining to be considered are the fifth and sixth. The fifth is to the court's overruling of objection to the following question asked the

witness Everett English when he was recalled to the stand on behalf of the State: "Can you tell the court and gentlemen of the jury what the state of your bank account was on that Saturday before?" The sixth exception is to the overruling of the objection to another question asked this same witness, namely: "Could you tell us what your earnings had been that month?" The question of law involved in both of these rulings is as to the admissibility of this evidence on the ground of relevancy.

While, in civil and criminal cases alike, the admissibility in evidence of any fact collateral to the main issue is ordinarily within the discretion of the trial court and all reasonable presumptions necessary to uphold its rulings will be indulged (*Meyerson v. State,* 181 Md. 105, 28 A. 2d 833, 835), the rule will not be extended to facts obviously irrelevant as well as prejudicial to the defendant. As stated by this court in *Hitzelberger v. State,* 174 Md. 152, at page 161, 197 A. 605, 609: "Evidence of collateral facts, or of those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, should be excluded, for the reason that such evidence tends to divert the minds of the jury from the real point in issue, and may arouse their prejudices. In addition to these reasons for the rule, the defendant, through the charges in the indictment, ordinarily would have no notice as to what evidence would develop with reference to such collateral offenses. * * * The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted. *Curry v. State, supra* (117 Md. 587, 83 A. 1030) ; *Wentz v. State,* 159 Md. 161, 150 A. 278; *Lamb v. State,* 66 Md. 285, 7 A. 399; *McAllister v. State,* 140 Md. 647 (648), 118 A. 147; *Wharton's Crim. Evid.,* 11th Ed. Vol 1, Sec. 345." 22 *C. J. S., Criminal Law,* Sec. 600, where the rule is thus expressed: "The rule that the evidence must be confined to the matters in issue applies to criminal as well

as civil cases, and evidence offered of matters which have no bearing on the matters in issue may and should be excluded." *Jones on Evidence in Civil Cases*, 4th Ed., Vol. 1, p. 236; *Best Evidence*, 10th Ed., par, 251.

In the case now under consideration the real point in issue is whether or not appellant is guilty of the charge in the indictment (rape). The witness, English, having admitted that he did accept $5 from appellant on the Sunday night of the alleged attack, testimony by him as to the state of his bank account on the preceding Saturday, or as to his earnings during the month of October, was clearly irrelevant to the main issue. It was also prejudicial to the appellant, inasmuch as the introduction of this testimony on the recall of the witness, giving his own unsupported version of his financial condition, left the appellant without any immediate means of refuting it, and tended to substantiate the witness on an immaterial point in the minds of the jury, and to correspondingly discredit the defendant as to his credibility on the main issue. As stated in the Hitzelberger case, *supra*, such evidence "tends to divert the minds of the jury from the real point in issue, and may arouse their prejudices."

How much money, if any, the witness English had in bank, or elsewhere prior to the happenings in this case, or the amount of his earnings, or whether or not he needed the $5 which he admits he accepted from the appellant that Sunday night, could have no possible relevancy to the charge in the indictment. The rule expressed in the Hitzelberger case, *supra*, and in the supporting authorities, therefore applies to the facts and circumstances of the case at bar and requires the exclusion of the testimony embraced within the fifth and sixth bills of exception.

For reversible error in the trial court's ruling on these, and also on the second exception, the judgment must be reversed and a new trial awarded.

*Judgment reversed, and new trial awarded.*