# GRACE COTHRON

*vs.*

# STATE OF MARYLAND.

*Murder—Evidence—Confession—Other Crime—Previous
Course of Life—Harmless Error.*

A confession or statement by one accused of murder, the making of which was not influenced by any promises, threats, or inducements of any kind, was admissible. .                    p. 103

Evidence of the movements of one accused of murder, shortly before and after the commission of the crime, were admissible as reflecting on her culpability.                    p. 106

Testimony that the persons charged with a murder, after its commission, left the state in an automobile the use of which was procured by a second murder, was admissible against one of the accused, although the testimony involved such other crime, the case being tried before the court sitting as a jury, and it being shown that she had been acquitted of a charge of larceny in connection with the second murder, and that a *nolle prosequi* was entered as to her in a prosecution for such murder.                    p. 109

Evidence which is relevant to the crime charged is admissible, although it tends to prove defendant guilty of another crime, but not because it so tends.                    p. 109

On a trial before a court sitting as a jury, when evidence of another crime is admitted, it may be presumed that the judges understood that the accused could not be convicted of such other crime.                    p. 110

On a prosecution for murder, committed in the course of an expedition in which defendant, her husband, and another man participated, and which was planned, as she knew, for the purpose of robbing a bank, and followed by the larceny of the automobile of the person murdered, *held* that it was proper to show, on defendant's cross-examination, what was her course of life before the murder as regards soliciting men, not for the purpose of proving her character, but in order to find out, if

possible, what part, if any, she had in the life of her husband and the other man while they were getting ready to rob the bank, and also as reflecting upon the question whether she acted under coercion by her husband.          pp. 110-114

Evidence that defendant had been convicted of the crime of kidnapping was admissible to affect her credibility.     p. 114

On a prosecution for murder, charged to have been committed while defendant, her husband, and another man were on an expedition in which it was sought to rob a bank, *held* that the admission of evidence as to her subsequent participation with her husband in a robbery committed in another state, while erroneous, was not cause for reversal, the trial being before judges sitting as jurors, and the evidence properly admitted clearly showing depravity of character.          p. 115

*Decided March 2nd, 1921.*

Appeal from the Circuit Court for Montgomery County (URNER, C. J., WORTHINGTON and PETERS, JJ.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John A. Garrett,* for the appellant.

*Alexander Armstrong, Attorney General,* and *Thomas L. Dawson, State's Attorney for Montgomery County,* with whom was *Lindsay C. Spencer, Assistant Attorney General,* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the court.

The appellant and her husband, Clarence Cothron, and William Eugene Landers, otherwise called "Gene" Landers, were jointly indicted for the murder of Homer Jones on the 11th day of June, 1919, in Montgomery County, Md. She elected to be tried by the court, and was, on the 25th day of May, 1920, convicted by a full bench of that circuit of murder in the first degree. The same day she was sentenced to

the Maryland penitentiary for the term of her natural life, and from that judgment this appeal was taken. There are seventeen bills of exception in the record, presenting rulings of the court on the admissibility of evidence.

It is contended in the brief for the appellant that there was no legally sufficient evidence to convict her of that crime but, as there is nothing before us to raise such question, it is unnecessary for us to discuss it, and we could not properly do so. The first exception was to the offer and introduction of a statement made by the appellant on September 19, 1919, in the presence of the State's Attorney for Cecil County, the Sheriff and Deputy Sheriff of that county, and written out by the stenographer of the State's Attorney. Later another statement was offered and admitted, which was made by her at the Baltimore City jail in the presence of Detective Carey of the Baltimore City Police Department, which was taken down by a stenographer and afterwards reduced to writing, in the presence of her mother, her stepfather and the warden of the City jail. Detectives Carey and Dougherty took it to the jail and, in the presence of the matron and warden, the appellant read it over, made some corrections, signed it and said it was correct. The ruling in admitting that statement in evidence is embraced in the second bill of exceptions. It was shown that there were no promises, threats, or inducements of any kind, to influence her to make either of those statements, and there was no proffer by her to prove that they were made by reason of any promises, etc., and they were properly admitted in evidence. There was, therefore, no error in admitting them, or either of them, even if they be treated as confessions and not as mere statements—a distinction which is made in some authorities cited by the State, but which we need not discuss.

Prior to the admission of the last mentioned statement, evidence of two detectives was given as to oral statements made to them by the appellant in the presence of her husband, when they were on their way from Florida, where they were arrested for what is spoken of as the Weldon murder,

and there was no exception taken to that testimony. In order
that the questions raised can be better understood, we will
first state some of the facts we find in the record which relate
to the movements of these parties before, at the time of, and
after, the murder of Jones. About the first of April, 1919,
the appellant and her husband came from Florida to Balti-
more. She became acquainted with Landers, whom she gen-
erally spoke of as "Gene," but sometimes as "John," and
testified that she had met him in Baltimore and introduced
him to her husband. Her husband and Landers made their
plans to rob the Highland Bank in Howard County, Md.
She testified that they went three or four times to Laurel,
which is not far from the bank, although in a different coun-
ty, in automobiles driven by colored chauffeurs, and that on
the 11th of June, 1919, her husband hired Homer Jones, a
colored man, to drive them out in a car which he ran, on
which day her husband and Landers intended to rob the bank,
and, as she described the plans, "Gene and Clarence (her
husband) were to go in and rob the old man and I was to
stay outside and if anybody started to go in the bank I was
to ask some questions so as to stall them off and keep them
from going in the bank. That was the time we went down
with Homer Jones." The "old man" she referred to was
connected with the bank and was usually alone about 12
o'clock. She said in the statement that they had told Jones
that they were going after a girl, but testified on the stand
that Jones knew about the proposed robbery—that Landers
said: "We are all fixed now; the chauffeur is right with us;
Jones is right with us. I have promised him so much money
to help us get away with the car. He is right on the deal."

Gene and Clarence concluded that there were too many
people about the bank and they abandoned the plan of rob-
bing it that day. They got something to eat, and drove down
a road leading off the main road and went into some woods,
where they prepared dinner, which the four ate. After fin-
ishing their dinner and talking for a while, she said she went
back to the car. There is conflict between her written state-

ments and her testimony as to who did the shooting and who
was with her in the car, as in the statements she said Gene
was with her and her husband stayed with Jones and killed
him, while in her testimony she said her husband was with
her and Gene killed him. She said she heard several shots—
thought there were three—and the one who did the shooting
called the other and they moved Jones' body further back.
She testified that she asked Gene why he killed Jones, and he
said he did not see any show to rob the bank. "He knew that
the chauffeur had noticed it and he was afraid to go back to
town for fear the chauffeur might squeal on him, and he said
that was why he killed him." She testified that she did not
know that they were going to kill Jones and that she did not
see him after she went to the car; that Gene threatened her
when she asked some questions.

They returned to Baltimore in Jones' car and she said
"John," as she called him then, got some licenses from the
boarding mistress where he lived. They rode out of town
and Landers put the licenses on the car, did something to the
old license and said he had disfigured it. In the statement
she stated that she suggested going to Atlantic City, where
her mother was, and they could sell the car, but she testified
that her husband suggested that. At any rate they went to
Atlantic City and the car was sold, with the aid of her
mother. They then went to New York, and in one of her
statements she said: "Gene wanted me to go into the cabarets
and pick up men so they could knock them off for their dia-
monds and money. I did not get anybody and we went to
Coney Island. Gene sat with the driver and pulled him for
all the information he wanted about getting money at Coney
Island." She said, in answer to a question asked by her
counsel why she did not leave Landers and her husband after
Jones was killed: "I did not get a chance to leave them. If
I started—they would not let me get away from them at all.
John said he would kill me, shoot me right down." She was
then asked: "After you left John, why didn't you leave your
husband?" And replied: "Why didn't I leave my husband?

Why I didn't know what he might do to me. Q. Did he ever say? A. No, why he has, yes, after Weldon was killed he has threatened my life."

She and her husband went to Florida and on the 14th of July, 1919, they were arrested there and brought back to Maryland, charged with the murder of the man named Weldon. At the trial Detective Dougherty had testified without objection that he did not think he had questioned the appellant as to whether she was in the car when the shooting of Jones occurred, and in explanation of that said: "The object at that time was to get to the Weldon body and that is why we did not. I did not hold them to the Homer Jones affair, because at that time there was a mystery. We had Weldon's car and his ring, but did not have his body, and the object of us going along at that time was to find where Weldon's body was." In her examination in chief she several times spoke of the Weldon murder. She had testified without objection that "after the killing of Homer Jones she, in company with Landers and her husband, went to Atlantic City, and from there to New York, where they were separated from Landers, she and her husband going to Philadelphia." She was then asked: "Where did you go from Philadelphia?" That was objected to, was overruled and is presented by the eighth bill of exceptions. She replied that they went from Philadelphia. to Florida. We can see no possible objection to that inquiry, as the State undoubtedly had the right to inquire into their movements shortly before and after the Jones murder. As was said by JUDGE STOCKBRIDGE, in *McCleary* v. *State,* 122 Md. 398: "If, as claimed by the State, a murder had been committed, the movements and declarations made by the traverser between the time of the commission of the crime and the time of his arrest could hardly be other than competent as reflecting upon his culpability *vel non.*" We can have no possible doubt about the correctness of the ruling in that (eighth) exception.

Before taking up the exceptions numbered from third to seventh, it will be convenient to consider the ninth, tenth,

eleventh, twelfth, thirteenth, fourteenth and fifteenth. They
relate to questions asked the appellant on cross-examination,
as to what occurred between Philadelphia and Florida and
after they reached Florida, which were connected with the
Weldon murder. The record sufficiently shows that before
this trial the appellant's husband had been tried for the mur-
der of John T. Weldon in Cecil County, in this State, and
had been convicted and sentenced to the penitentiary for life,
and that the appellant had been tried and acquitted of the
larceny of a ring which Weldon wore and that the charge of
murder of Weldon against her had been abandoned. Indeed,
in the brief for the appellant it is stated that it was proved
and admitted in evidence, before the appellant took the stand,
that her husband had been tried, convicted and sentenced for
the murder of Weldon, and was then undergoing sentence in
the penitentiary, and that it had been proved by the State's
witnesses, and admitted as a fact, that the appellant was
jointly indicted with her husband for the murder of Weldon,
but a *nolle prosequi* had been entered in her case, and that
she had been indicted for robbery of a diamond ring of Wel-
don's, but had been acquitted of that charge in Cecil County.
After saying in the eighth exception that they had gone from
Philadelphia to Florida, she was asked in the ninth, "Whose
automobile did you use?" And replied, "John T. Weldon's
automobile"; then in the tenth: "How did you get the use
of his automobile to get from Philadelphia to Florida?" to
which she answered, "My husband hired the car in the be-
ginning and then he killed the chauffeur"; in the eleventh,
"Where were you when that occurred?" she replied, "I was
with him, but I was out to the car when the shooting started";
in the twelfth, "What became of the diamond ring?" she said
that "The lawyers have that in Florida"; in the thirteenth,
"You wore it down there?" and replied, "Yes. I was tried
for that case." "Yes, I was acquitted for it; found not guil-
ty"; in the fourteenth, "How did you get the ring?" and
answered, "My husband brought it up to the car after he
killed Weldon"; and in the fifteenth, "Your husband brought

it and gave it to you and you wore it down to Florida?" and she repeated that her husband had given it to her, had his revolver in one hand, the ring in the other and told her to take it, and she was afraid after he had killed the man that he might turn on her.

It is not shown on what day Weldon was murdered, but it was in Cecil County, which is a short distance from Philadelphia, and as they were arrested on the 14th of July in Florida, it must have been shortly after the murder of Jones, which occurred on June 11th. It was undoubtedly competent to prove their movements at that time, and although the testimony involved another crime, it reflected upon their guilt to prove that, in getting away from Maryland where the Jones murder was committed, the chauffeur was killed and the automobile he was driving then used to continue their journey to Florida. The circumstances of the Weldon murder connect it with the Jones murder, and after they had disposed of the Jones automobile they would naturally seek to get away from the region where it occurred, and as another man was murdered and his automobile used for the trip to Florida, instead of going by train, or in some lawful way, it would be difficult to exclude the suggestion that would arise in the mind of anyone, that the murder was a part of the plan to avoid detection in reference to the Jones murder and enable them to escape. It may be that it was not then known by the authorities that Jones had been murdered, or who murdered him, but even if the conscience of a criminal has become too hardened to trouble him, his fears of detection may cause him to flee and to do things which sometimes enable the authorities to detect him. It may be that the examination of the appellant in reference to the Weldon case went more into detail than was necessary, but probably it was done on the theory that it was proper to inquire, on cross-examination, into the facts, so as to ascertain whether the appellant was under the coercion of her husband, or so connected with the Weldon matter as to reflect upon the Jones murder. As it was admitted that the trials for the Weldon murder and

the larceny of the ring were over before the appellant was tried in this case, it is impossible to see how she could have been injured by what was brought out, even if some of the inquiries went further than were admissible. Indeed, explanations by her might have helped her, if she was innocent, for although when a case is tried before a court, instead of a jury, the court is governed by the same rules of law as the jury, it would have been practically impossible for the court not to have known of the Weldon murder, even if they did not know of the details, and, as we have seen, it did know of it from what was proven and admitted at the trial. When one murder and theft follow another so quickly, and the parties charged with the first are known to be closely connected with the second, under such circumstances as are shown in this case, there might be more danger of injustice being done to an innocent person, by excluding all inquiries into it, than by proving what occurred—especially when being tried before the court and when it could be shown, as was done in this case, that the one on trial for the first had been acquitted of a charge in connection with the second and a *nolle prosequi* had been entered as to her for the second murder.

It is well settled that evidence which is relevant is not made inadmissible by reason of the fact that it tends to prove the defendant guilty of a crime other than the one for which he is being tried. Such evidence is not admitted because it is proof of the other crime, but because of its relevancy to the charge upon trial. In *People* v. *Rogers,* 192 N. Y. 331, 15 Ann. Cases, 177, the prisoner was being tried for the murder of Fred R. Onley and evidence was admitted of his murder of William Onley and Alice Ingerich as well as an assault on the latter's mother. It is true they all happened the same day, and very close together, but the principle is the same, if the other crime is relevant to the case upon trial, as showing motive, intent, etc. See also *State* v. *Dickerson,* 77 Ohio St. 34, 11 Ann. Cases, 1181; *Jaynes* v. *People,* 44 Col. 535, 16 Ann. Cases, 787; *Thompson* v. *U. S.,* 142 Fed. 14, 7 Ann. Cases, 62; 1 *Wigmore on Ev.,* Sec. 210; *State* v. *Hyde,* 234

Mo. 200, Ann. Cases, 1912 D, 191; *Koontz* v. *State,* 10 Okla.
Crim. 553, Ann. Cases, 1916 A, 689; 1 Whart. Cr. Ev.
(10th Ed.), Secs. 38-39; *State* v. *Campbell,* 73 Kan. 688,
9 L. R. A. (N. S.) 533, 539 and article on proof of other
crimes in 23 *Am. & Eng. Ency. of Law,* 247-256. Among
the cases in this State are *Kernan* v. *State,* 65 Md. 253, and
*Guy* v. *State,* 90 Md. 29. There are a number of cases in
which it has been held that specific acts of women cannot be
proven as tending to show immoral character, such as *Shart-
zer* v. *State,* 63 Md. 149, where it was held that evidence in
regard to general character of the prosecutrix for truth and
veracity or for chastity was admissible, but not proof of
specific acts. See also *Brown* v. *State,* 72 Md. 468; *Avery*
v. *State,* 121 Md. 229. In the case of *State* v. *Hyde, supra,*
it was said that evidence of other crimes had been admitted
in that State "to prove the specific crime charged when it
tends to establish (1) motive, (2) intent, (3) absence of mis-
take or accident, (4) a common scheme or plan embracing the
commission of two or more crimes so related to each other
that proof of one tends to establish the other, (5) the identity
of the person charged with the commission of a crime on
trial."

Without citing other cases, we are satisfied that there was
no reversible error in the ninth to the fifteenth exceptions,
inclusive. Of course, in most trials by juries, when evidence
of other crimes is admitted, it is proper, and generally nec-
essary, for the court to instruct the jury as to the purpose of
admitting the evidence and to caution them that they cannot
convict the accused for such other crime, but in this case the
trial was before the court and presumably the judges under-
stood the law on that question and were guided by it. We
will consider the third, fourth, fifth, sixth and seventh ex-
ceptions together. The appellant was asked on cross-exam-
ination what she was doing for a living, whether she was
earning a living for her husband and herself and she replied
she was not working and was not doing anything for a living.
She was then asked: "Were you not street *working?*" But

that question was withdrawn and she was asked: "Were you not engaged in soliciting the attentions of men on the streets and about Baltimore City at time for a consideration?" She answered, "No." She was asked whether she ever so stated to Detectives Dougherty and Bradley and said "Not at that time," and upon being asked, "At any subsequent time?" replied, "At other times, yes," and upon being asked, if she never was so engaged, why she told them she was, she said she did not tell them she was at that time; she told them about different times, but she never told them at that time. She was then asked: "Were you ever engaged in that sort of life?" And upon an objection to it being overruled the third exception was taken. She replied: "Yes, I had been, yes." She was then asked: "Were you not following that life while you were in Baltimore?" An objection to that was overruled and that constituted the fourth exception. She replied: "Yes, sir." She was then cross-examined in reference to a statement made by her in the office of the State's Attorney for Cecil County and was asked: "Did you also say, immediately following that, 'I kept on meeting men and getting money for my husband while I was in Baltimore, and used it for paying expenses for both of us in Baltimore'?" An objection to that question was embraced in the fifth exception. She answered: "Yes." And in the sixth exception was asked: "Is that true or not?" And replied: "Yes, it is true." In the seventh she was asked: "Did this course of conduct continue the entire time you were in Baltimore, or as you said a while ago, only part of the time?" And replied: "That was about three weeks after I reached Baltimore."

Some of those questions went right far, but she was asked in chief why she stayed with John Landers and her husband after the killing of Homer Jones and she answered as stated above. But if she had wanted to leave either or both of them she could have done so at Atlantic City, when she was with her mother, but she not only did not attempt to leave them, but went away with them, and, if her testimony is true, deceived her mother about the Jones automobile. She ad-

mitted she had been going with Landers before her husband knew him, and if she was getting money for her husband and herself while she was in Baltimore, and using that to pay expenses for both, she could not have been in such fear of her husband as to be so coerced, as not to be guilty of a crime committed by her in his presence. It is true that she said it was about three weeks after she reached Baltimore, but her testimony shows that she was with Landers up to the time of and after the Jones murder, and there are other things in the record which indicate that she continued the life spoken of in Baltimore longer than three weeks.

The Attorney General and State's Attorney for Montgomery County argued that the testimony was admissible as tending to show that the appellant was not coerced by her husband in her connection with the Jones murder. At common law, when a criminal act was committed by a married woman, jointly with or in the presence of her husband, she was generally presumed to be acting under his influence or coercion (21 *Cyc.* 1355; 13 *R. C. L.* 1237; *Nolan* v. *Traber,* 49 Md. 460), but there are some well established exceptions. Those mentioned in *Nolan* v. *Traber* are treason and murder. In that case the court, through JUDGE BOWIE, said: "The relation of husband and wife, however absolute in the past, no longer implies such subserviency of the latter as to make her the slave of her husband," and after referring to gradual modifications of the common law in the control of her property and person said: "The better opinion would seem to be that the presumption of coercion by the husband, in cases of indictment or prosecutions against husband and wife jointly, is only *prima facie,* subject to be controlled by evidence that the wife intervened voluntarily and not by compulsion."

So although to the crime of murder the doctrine of coercion does not apply, yet we find in the brief of the appellant that it is contended she was not liable for a crime committed in the presence of her husband, and it would not necessarily be incompetent to prove facts which tend to show that there was no coercion, especially as there is some difference be-

tween the authorities as to whether robbery is one of the crimes where the presumption of coercion should prevail, and as it is not one mentioned by JUDGE BOWIE above. There was another crime committed in connection with the murder of Jones, besides the robbery which was intended to be committed, that is to say, the larceny of the automobile. But beyond what we have said, the appellant denied all knowledge of an intent to kill the chauffeur, testified she was not immediately present but was sitting in the automobile some little distance from where the murder occurred, and it was only when she heard the shots, and what had been done, that she had any idea of such an act. As she started out to be an active party in the robbery of the bank, went there with the intent to talk to others on the outside and keep them from going in while Landers and her husband went in to rob the bank, and was fully aware before she went what the object was, there was certainly some evidence of her complicity in the proposed robbery. She knew that her husband and Landers were armed and presumably knew that they would be ready to use the pistols if they thought it necessary to accomplish their purpose or to escape. She certainly must have been aware of the kind of men she was helping, and she said in one of her written statements that "Gene Landers said to me about paying for chauffeur (referring to Jones) and I told him that it was his turn and he said that he would knock his negro off and take his car and run it near the town. I said you don't mean to shoot him and he said no, but we have to find out if he had a revolver. He told me not to be frightened if I did hear a gun go off as they were going to have a little target practice."

While it does not necessarily follow that a woman, who would be willing to support herself and her husband by such disreputable means as she admits she was engaged in, would commit the crime of murder, it was certainly some evidence tending to show that she was not coerced to commit such a crime as she was charged with, when she had the opportunity to get the aid of the other men she was going with if she

wanted to avoid having any part in the crime of robbery of
the bank, and possibly murder in committing that crime, and
was practically free from her husband to go as she pleased in
her efforts to support him and herself. It may have been
that she was obtaining money for them to live on while her
husband was giving his time to Landers in preparing for the
robbery of the bank, for, although she said at one place that
she only introduced Landers to him about one week before
the Jones murder at the market, in one of her written state-
ments she said he came to their room two weeks before she
left Baltimore and she then introduced him to her husband
and went to market to get something to eat. It was at that
time, after she complained about letting a little girl who was
with her see a revolver, that she said Clarence remarked "they
would get some money and we would be fixed for life."

Without further discussing those exceptions we think it
was permissible to cross-examine her as to what she was doing
before the murder of Jones, not for the purpose of proving
her character, but to find out, if possible, just what part, if
any, she had in the life of Landers and her husband while
they were getting ready to rob the bank, as well as reflecting
upon the question of coercion. It could not possibly have
injured her character more than what was already proven.
She was brought from the penitentiary for this trial, having
been convicted of another offense, which is said in the brief
on her behalf to have been kidnapping, and that was of course
known by the judges and indeed stated at the trial. That
was admissible evidence under our decisions to affect her
credibility. So we cannot hold that there was reversible
error in any of those exceptions.

We have had more doubt about the 16th and 17th excep-
tions than any of the others. In the sixteenth there is a
long question as to whether she had not gone out and picked
up a man who was drunk, took him to their room, gave him
whiskey, kept him drunk and then robbed him of money, a
ring and a watch. She said part of it was true and part of
it was not true. The latter seemed to be that she did not

know how much her husband had gotten out of the man's shoe until she was told at Atlantic City that it was about fifty dollars. She was then asked whether she left Coney Island because she wanted to get away from John Landers or because that man had been robbed. That question is presented by the seventeenth bill of exceptions. We think there was error in both of those exceptions, particularly the sixteenth, but have carefully considered the question whether the error could possibly have injured the prisoner and are convinced that the testimony in neither of those exceptions could have done so. It cannot be, under any principle of justice, that this judgment must be reversed because of those errors. The appellant is shown by the record to have actually taken part in the preparations and plans for robbing the bank, and that, together with the murder of Jones, the larceny and sale of his automobile, and the deception of her mother in reference to it, her confessed conduct with men other than her husband (outside of these exceptions), what transpired when Weldon was killed and his ring and automobile stolen— at least by her husband in her presence, if she be conceded to be innocent—her contradictory statements under oath as to who killed Jones and then coming to the trial below as a convict and inmate of the penitentiary, for kidnapping, would seem to present a picture which needed no such shading as the evidence in these exceptions is said to have given her character. It is impossible to believe that the learned judges below, who sat as jurors as well as judges, could have been influenced in the slightest degree in reaching the verdict rendered by them by the evidence we are now considering. We regret to have to thus speak of any woman, especially a woman just eighteen years of age, but the facts referred to were for the most part proven by her. We cannot hold, therefore, that there was any reversible error in either of those two exceptions, and there being none in any of the other exceptions, the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs.*