## SIDNEY SMITH *v.* STATE OF MARYLAND

[No. 32, April Term, 1943.]

*Decided July 16, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*Julius P. Robinson* and *James M. Hoffa*, with whom was *Joel J. Hochman* on the brief, for the appellant.

*Robert E. Clapp, Jr., Assistant Attorney General,* with whom was *William C. Walsh, Attorney General,* and *J. Bernard Wells, State's Attorney,* and *Bernard G. Peter, Assistant State's Attorney,* both of Baltimore City, on the brief, for the appellee.

BAILEY, J., delivered the opinion of the Court.

The appellant, Sidney Smith, was indicted by the Grand Jury of Baltimore City for the murder of his wife, Mae K. Smith, on February 7, 1943. The indictment was returned on March 8, 1943. On March 17, 1943, he was arraigned, entered a plea of not guilty, waived a jury trial and at his election was tried before the judge then sitting in Criminal Court, Part 2, of Baltimore City. He was found guilty of murder in the first degree. After a motion for a new trial was overruled by the Supreme Bench of Baltimore City, he was, on April 12, 1943, sentenced to be hanged, and it is from this judgment that he has appealed to this court.

While the record is somewhat confused, it appears that six exceptions were taken at the trial, five to rulings on the admissibility of evidence, and the sixth to the refusal of the court to direct a verdict of not guilty at the conclusion of the State's case.

The exceptions to the evidence are as follows:

First: To the admissibility of testimony of a witness that a terrible thumping noise "was the breaking of cement" and that "it came from the first floor next door."

Second: To the admissibility of a conversation with the appellant relating to the absence of his wife from her home.

Third: To the admissibility of evidence relating to blood stains on certain articles in the home of the appellant.

Fourth: To the admissibility of a pick, shovel, hatchet and axes found in the appellant's apartment and in the cellar immediately under it.

Fifth: To the admissibility of a photograph of the deceased taken shortly after the discovery of her body.

The appellant and his wife resided in the first floor apartment of a three-story house at 425 North Carey Street. The second-floor apartment was occupied by Rose Adams and Catherine Harris, and the third-floor apartment by Alberta Hall. Under the house there is a cellar about sixty-six feet long, sixteen feet wide and seven feet high. The cellar has a cement floor. On the night of February 3rd or 4th a little after eleven o'clock, Elizabeth Young, who lives in 423 North Carey Street, a row house adjoining the house occupied by the appellant and his wife, heard a terrible thumping noise. We quote her testimony:

"It was the breaking of cement. And I don't know where it came from exactly, but I know it came from the first floor next door. I took off my shoe and rapped on the wall three or four times very loud. Then the noise ceased. I just heard a swish. I went to bed and stayed there.

"Q. That was on February 3rd and February 4th? A. At night, yes. That was between eleven o'clock and two a. m. the next morning.

"Q. How long did the noise last? A. About an hour and a half to two hours.

"Q. Did you hear any noise in your house again? A. I heard the same noise on Saturday night after eleven o'clock. That kept up until nearly two o'clock a. m. Sunday morning."

The admission of that part of the above testimony that "it was the breaking of cement" and "it came from the first floor next door" is the basis of the first exception.

Appellant's wife was last seen alive on Saturday, February 6. Her sister, Artilla Jones, went to the house at 425 North Carey Street, rang the door bell and was met by the appellant, who stated that his wife was not home. However, the wife was there and asked her sister to come in. She was crying at the time. Daisy Mae Heath also saw her twice on February 6, once at six o'clock and again at eight-thirty in the evening.

Catherine Harris, who occupied the bedroom on the second floor right over the Smiths' bedroom, testified that "on February 6th I heard a noise right under me. It sounded like someone was arguing, by being someone underneath I thought it was Mr. and Mrs. Smith. It lasted about five minutes. After that I heard another noise. It sounded like something had fallen. After that I did not hear any more."

On Monday, February 8, between two and three o'clock in the afternoon, Daisy Mae Heath saw the appellant putting locks on the cellar windows that opened on Carey Street.

Artilla Jones missed her sister on Tuesday, February 9. She asked the appellant "if Mae had come from work. He said no, Mae is working longer hours." On Wednesday she talked with appellant again in the presence of her husband and her brother, Horace Keith, and at that time appellant said that Mae was in New York and that he was going to New York to look for her. On the same day he talked with Mae's mother, Viola Keith. Viola testified that "I asked him where was my daughter. He said that he didn't know, that he was going to New York to find her. I said, you had better find her and bring her back or hear something from her. He said, I am going to New York and if she is dead what are you going to do about it? That is what he told me."

Horace Keith was asked about the above conversation between the appellant and Artilla Jones. His answer was as follows: "I asked him had he seen anything of Mae. Had he found her yet. He said, no, he ain't seen her." There was then an objection, and the action of the court in overruling the objection constitutes the second exception.

On Saturday, February 13, Artilla Jones again talked with the appellant and he told her that "he saw Mae in New York going in a cafe with another man and she was coming out with a man. I said, did she tell him to tell me anything? He said, yes, she told me to tell you not to worry, when she gets there she will tell you."

Alberta Hall, the occupant of the third-floor apartment at 425 North Carey Street, also talked with the appellant on Thursday, February 11 and on Saturday, February 13. On the first occasion he told the witness that "he was going to New York. She (Mae) had some people in New York, he was going to see if she was in New York." On the second occasion he said "that he had been to New York, had seen her and she was all right. When she got where she was going, she would write."

Lieutenant Frank J. Plum, desk lieutenant at the Southwestern District, testified as to the following conversation with the appellant on Saturday, February 13: "He said, I saw my wife last night. I said, where? He said, in New York. I said, where is she stopping in New York. He said, I don't know. He said she had told him as soon as she got settled and she got a place permanent she would write to him. I said, when did you come back from New York? He said, this morning. He had been drinking."

On Monday, February 15, Sergeant Joseph G. Zaruba of the Baltimore police, went with Artilla Jones and George Still to 425 North Carey Street. The front door was unlocked, but it was necessary for the sergeant to break a lock before entering the Smith apartment. He examined the room closely and saw blood spots on the bed, on the wall above the bed and on a picture hanging over the bed. The mattress was covered with blood.

Continuing, the witness testified as follows: "I then went with George Still to the cellar. I found where some concrete was broken in front of the furnace. I got the woman out. I asked permission to go to the third floor and called in to Lieutenant Rusk and asked for No. 71 radio car with Officer Leyh and Officer Heisenbuttle. They came down with Officer Roche and they immediately went in the cellar, all five of us and started to dig. We found a pick and shovel down there. We started to get the dirt out. About two foot down was a board, that board there (indicating). It was lying midway of the

grave. We got that board out. We went down further. That is when we found the body."

Lieutenant John G. Rusk was called to the premises by Sergeant Zaruba and he described what he found as follows:

"In the bedroom on the first floor, the mattress was covered with blood and this picture (indicating) hanging above the bed, there were spots of blood on it and also on the wall near the picture were several spots of blood."

It was at this point that a motion was made to strike out the testimony concerning the blood, and the court's refusal to do so constitutes the third exception.

Lieutenant Rusk further testified to the finding of a pick and shovel in the cellar, which were identified by the appellant as his property, and an ax with a broken handle in the cupboard in the back room of the Smith apartment.

Sergeant John C. White testified that he found a hatchet in the kitchen of the first-floor apartment and the ax with the handle in the cellar.

The action of the court in admitting the pick, shovel, hatchet and two axes in evidence is the basis of the fourth exception.

After the body was discovered in the grave in the cellar it was partially removed and the legs placed on the concrete, with the head down. It was in this position that a photograph of the body was taken in the presence of the police officers. When this photograph was offered in evidence there was an objection and the action of the court in admitting the photograph constitutes the fifth exception.

An autopsy was performed by Dr. Robert Lee Graham, Assistant Medical Examiner of Baltimore City, on February 16. Dr. Graham testified that the body had been dead approximately a week. He found two enormous gaping wounds on the right side of the face, one about five and one-half inches long and about two inches wide, beginning at the lower tip of the right ear, extending

to the nose, practically splitting the right side of the face in half, and penetrating through the jaw bone into the roof of the mouth, the other back of the right ear going into the base of the skull and severing a bone three-quarters of an inch in thickness. He stated that the wounds were caused by a sharp instrument and that either of them could have caused death.

We think the evidence objected to in the first exception is clearly admissible. The witness testified that on two occasions she heard a terrible thumping noise. She then proceeds to tell the effect that it produced upon her mind. To her the sound was the breaking of cement, and came from the first floor next door.

It is stated in *Wharton's Criminal Evidence*, 11th Ed., Vol. 2, Par. 1011:

"Opinion, so far as it consists of a statement of an effect produced on the mind, becomes primary evidence, and hence admissible, whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury. This is particularly true with regards to noises and odors. A person need not be an expert to be able to testify that he smelled chloroform, or that a certain liquid smelled or tasted like whisky. Sound, incapable as it is of description except by comparison with some other familiar sound, must frequently be the subject of non-expert opinion if any testimony at all is to be had upon certain points. A non-expert witness may testify as to his impression of the nature and location of sounds, as, for example, whether shots sounded as though fired inside of a building or in the open air, or whether they sounded like a drum or something deep. A witness may characterize a sound as being like the report of a rifle or shot-gun, or that shots sounded like those of a rifle even though he cannot say definitely that he knows the difference between a rifle shot and a pistol shot. Such evidence is simply a statement as to the nature of the impressions of sound left upon the ear, and is not opinion evidence."

The same general rule is stated in *Wigmore on Evidence*, 3rd Ed., Vol. 7, Par. 1977.

In *Wimpling v. State*, 171 Md. 362, at page 375, 189 A. 248, at page 255, it was said by Judge Offutt:

"On the other hand, it constantly happens that observed facts or conditions are of such a character that they cannot be so described that one not an eye witness can fully understand them, without including in the description the witness' opinion, because the substantive fact may be affected by factors and conditions which because of their number, or their evanescent and intangible character cannot be sufficiently described without including the subjective impression which they made upon the witness."

Nor do we find any reversible error in the second exception. The witness, Horace Keith, was asked about a conversation with the appellant on Wednesday, February 10, four days after the disappearance of his wife, and at a time when, according to the testimony of the medical examiner who performed the autopsy, she was already dead. The declarations of the appellant at this time and under these circumstances were clearly admissible.

In *McCleary v. State*, 122 Md. 394, at page 398, 89 A. 1100, at page 1102, it was said: "If, as claimed by the State, a murder had been committed, the movements and declarations made by the traverser between the time of the commission of the crime and the time of his arrest could hardly be other than important as reflecting upon his culpability *vel non*." See, also, *Cothron v. State*, 138 Md. 101, 113 A. 620.

Moreover, the witness, Artilla Jones, had already testified as to the same conversation without objection, and similar conversations with the witnesses, Viola Keith, Alberta Hall and Lieutenant Plum, set forth above, were admitted in evidence without objection. Under these circumstances, the admission of the testimony objected to, even if inadmissible, would not constitute reversible

error. *Summons v. State*, 156 Md. 382, 144 A. 497; *Ford v. State*, 181 Md. 303, 29 A. 2d 833.

What we have said with respect to the first exception is equally applicable to the third. The witness' statement that the mattress was covered with blood and that there were spots of blood on the other articles was an expression of his opinion of what he saw and the impression which it made upon his mind. He is not required to be an expert before expressing this opinion.

*Wigmore on Evidence*, 3rd Ed., Vol. 2, Par. 568, states: "* * * it has been generally held that special qualification is not required upon the question of whether a stain is of blood."

In *People v. Preston*, 341 Ill. 407, 173 N. E. 383, 388, 77 A. L. R. 631, it is said: "Witnesses who were at the scene of the crime the next morning testified to finding blood stains on the car and blood on the grass on the roadside near where the body was found. It is claimed that this evidence was incompetent as being the conclusions of non-expert witnesses. The existence of blood in large quantities, where the stains are recent and marked, may be distinguished by most persons, and, while it is more difficult to discover the character of a few drops or a smaller quantity, it does not necessarily follow that non-experts cannot testify to its reality as a matter of fact. *Greenfield v. People*, 85 N. Y. 75, 39 Am. Rep. 636. It was for the jury to determine the weight to be given to the testimony. *People v. Korak*, 303 Ill. 438, 135 N. E. 764."

And in *Wharton's Criminal Evidence*, 11 Ed., Par. 997, there is the following statement of the rule:

"The appearance of things with which men are familiar in everyday experience, and from which they draw conclusions that constitute a basis for their actions, is of high testimonial value, as tending to establish certain facts under investigation. These observations apply to every ordinary or usual occurrence. For these reasons non-experts have always been permitted to state their conclusions from the facts observed, as that

certain stains on clothing or other substances looked like or resembled blood stains, and to describe them by color and appearance; nor is it required as a testimonial qualification that such witness should be an expert in such matter."

In line with the above authorities and in view of the statement of the court, who in the instant case was sitting as a jury, that he was only accepting the evidence objected to as evidence of blood from the layman's point of view in appearance, and not from a scientific demonstration that it was blood, we can find no reversible error in the admission of this testimony.

The fourth exception complains of the admission in evidence of the pick, shovel, hatchet and axes found on the premises occupied by the appellant or in the cellar where the body of his wife was buried. We feel that all the articles were admissible under the rule laid down by this court in the case of *Wilson v. State,* 181 Md. 1, 5, 26 A. 2d 770, 773, where the question arose as to the admissibility of certain articles capable of producing abortion which were found at the time of his arrest on the premises of a defendant charged with such crime. In sustaining the admissibility of such articles, this court, speaking through Judge Delaplaine, said:

"The law of evidence does not require that an instrument, found at or near the place of an arrest, must be positively identified as the instrument used in the commission of the crime, before it may be used in evidence. A lack of positive identification of an instrument of crime affects the weight of the evidence rather than its admissibility. If a question is raised as to the connection of certain articles with the crime, the evidence should be submitted for the determination of the jury."

In the instant case the testimony of the medical examiner who performed the autopsy was to the effect that the fatal wounds were inflicted by a sharp instrument, capable of cutting through a bone in the skull three-quarters of an inch thick. Such wounds could have been inflicted by the hatchet or axes offered in evi-

dence. And in view of the uncontradicted evidence that the body was buried in a grave dug in a cement cellar there can be no doubt of the admissibility of the pick and shovel found in the cellar.

The last exception to the evidence is to the admission of the photograph of the body of the deceased taken at the time and under the circumstances already related. The situation in the case before us is similar to that of *Snowden v. State*, 133 Md. 624, 106 A. 5, 8. In the Snowden case, certain photographs were identified by a doctor as representing marks and bruises on the body of the victim at the time he first saw it and at the time of the autopsy. These marks and bruises were fully described in the evidence and it was not denied that they existed. In holding that the photographs were admissible, the court said:

"As these photographs were merely representations of injuries which had been fully described by the witness, and not denied to exist, their introduction in evidence could not be held to have injured the accused."

In the instant case the police officers had testified as to the position of the body at the time the photograph was taken and the medical examiner had testified in detail as to the nature of the wounds. The photograph presented to the court, sitting as a jury, a graphic representation of facts already in evidence without objection and not denied to exist. We, therefore, hold that the admission of the photograph was proper.

We find nothing in the case of *Pearson v. State*, 182 Md. 1, 31 A. 2d 624, 628, in conflict with the view here expressed. In that case Judge Melvin has discussed in detail the law governing the admission of photographs and no good purpose would be served by repeating it in this opinion. We will only repeat the general rule as laid down in *Wimpling v. State, supra* (373).

"Ordinarily the admissibility of photographs as evidence is within the discretion of the trial court (*Snibbe v. Robinson*, 151 Md. 658, 663, 135 A. 838; *Baltimore v. Biggs*, 132 Md. 113, 117, 103 A. 426), but that rule is

only applicable where the photographs are shown by competent extrinsic evidence to be true representations of the scene or object which they purport to represent at the time when the appearance of such scene or object is relevant to the inquiry in connection with which the photographs are offered, 22 *C. J.* 921; *Baltimore v. Biggs, supra; Western Md. Rwy. v. Martin,* 110 Md. 554, 73 A. 267; *Consolidated Gas, Electric Light & Power Co. v. State,* 109 Md. 186, 72 A. 651."

In the case before us there was the "competent extrinsic evidence" and there was no reversible error in the admission of the photograph.

There can be no question about the correctness of the court's ruling in refusing to direct a verdict of not guilty at the conclusion of the State's case. In *Ridgely v. State,* 75 Md. 510, 23 A. 1099, 1100, at the close of the State's case, the traverser offered a prayer that the State has offered no evidence legally sufficient to support the indictment, and their verdict must be for the traversers. This prayer was refused, and on appeal it was said in reference to that ruling: "In view of the decisions of this court there ought not to be any doubt about the question here presented, for it has been frequently held that no court in this State, whatever may be the rule elsewhere, can be required by counsel or jury in criminal cases to give instructions either upon the law of the crime or the legal effect of the evidence."

In *Myers v. State,* 137 Md. 482, 113 A. 87, 88, the contention was that there was no evidence in the case legally sufficient to show that the appellants had committed the offense charged in the indictment and therefore the verdict of guilty returned by the jury was illegal and no judgment should have been entered on it. The court said: "If the question of the guilt or innocence of the appellants were before us for determination, or if we were free to consider the legal effect of the evidence in connection with any ruling of the court made during the trial of the case, these arguments would have great force; but under the long-settled law of this State such

questions as these were exclusively for the jury which tried the case, and their findings in regard to them cannot be reviewed in this court. * * * Under the Constitution of this State, and the decisions of this court construing it, juries in criminal cases are 'judges of law as well as of fact'."

See, also, *Willie v. State,* 153 Md. 613, 139 A. 289, and *Berger v. State,* 179 Md. 410, 416, 20 A. 2d 146, 149.

In the latter case the court says: "Under the Maryland Constitution, Art. 15, Sec. 5, the jury are the judges of both the law and the facts in the trial of all criminal cases in the State. Of course, if the defendant elects to be tried before the court without a jury, the court is substituted for the jury and has the same functions in passing upon the guilt of the accused. *League v. State,* 36 Md. 257, 264. The Court of Appeals has constantly refused to pass upon the question of the sufficiency of evidence to establish the crime with which the accused is charged for the reason that such action would usurp the constitutional function of the jury. Where there is no reversible error in the rulings of the trial court, the verdict and judgment must stand."

Finding no reversible error in any of the exceptions, the judgment of the trial court must be affirmed.

*Judgment affirmed with costs.*