CHERNOCK *v.* STATE

[No. 9, October Term, 1953.]

148

*Decided November 6, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Alan H. Murrell,* for appellant.

*Ambrose T. Hartman,* Assistant Attorney General, with whom were *Edward D. E. Rollins,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City and *Theodore C. Waters, Jr.,* Assistant State's Attorney, on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Morris Chernock, appellant, from a judgment and sentence, in a trial before the trial judge and a jury, entered upon a verdict of guilty on two counts of an indictment charging him with keeping a room for the sale of lottery tickets, and with the possession of lottery paraphernalia.

Before pleading to the indictment, appellant filed a motion to strike the entire petty jury panel assigned to the Criminal Courts of Baltimore City for the reason that the twenty-five jurors, constituting the jury panel, had been rendered "not impartial" because of their daily attendance as spectators in Criminal Court, Part One, while not actually serving on a jury trial. This contention is based primarily on Rule 1. K. of the Rules of the Supreme Bench of Baltimore City which provides that, while not in actual service in any of the common law courts, "except in the case of jurors drawn for service in the criminal courts", the jurors shall assemble in a central place in the Court House provided for that

purpose, and shall remain there for future assignments. It is evident by the plain wording thereof that jurors drawn for service in the criminal courts are excepted from this rule. The appellant contends that by allowing the jurors in criminal cases to hear other criminal cases as spectators, the impartiality of said jurors is likely to be destroyed. Appellant cites as authority for this contention, Article 21, of the Declaration of Rights, Constitution of Maryland, which provides in part: "That in all criminal prosecutions, every man hath a right * * * to a speedy trial by an impartial jury * * *." The appellant did not exercise his privilege to examine prospective jurors on their *voir dire* which, of course, he had the right to do. *Whittemore v. State,* 151 Md. 309, 314-315, 134 A. 322; *Alexander v. Grier & Sons Co.,* 181 Md. 415, 419, 30 A. 2d 757; *Baltimore. Radio Show, Inc. v. State,* 193 Md. 300, 330, 67 A. 2d 497. The purpose of such examination is to determine possible cause for disqualification of jurors by reason of bias, prejudice, or otherwise. *Cohen v. State,* 173 Md. 216, 224, 195 A. 532, 196 A. 819. In the absence of a showing by examination on *voir dire* that they were so prejudiced, we see no reason why jurors would be prejudiced by hearing other criminal cases. We have been unable to find any authority to support appellant's contention. In fact, the authorities seem to be otherwise. *King v. Dale,* 1 Scam. 513, 2 Ill. 513; *State v. Philpot,* 97 Iowa 365, 66 N. W. 730; *Sandlin v. State,* 19 Ala. App. 583, 99 Sou. 784; *Ford v. State,* 164 Ga. 638, 139 S. E. 355; *Noe v. State,* 4 How. 330, 5 Miss. 330; *Quinlan v. State,* 13 Ga. App. 669, 79 S. E. 768; *Wesley v. State,* 61 Ala. 282; *Commonwealth v. Wasson,* 42 Pa. Super. Ct. 38; *Fletcher v. Commonwealth,* 106 Va. 840, 56 S. E. 149; *Haussener v. United States,* 8 Cir., 4 F. 2d 884, 886; *Ramos v. United States,* 1 Cir., 12 F. 2d 761, 762; *Camp v. United States,* 8 Cir., 297 F. 452.

The appellant further contends that the affidavit and application for the search warrant in this case does

not show probable cause for the issuance of a warrant to search the premises at 3926 Green Spring Avenue. For the purposes of this case, this affidavit and application recites in effect that the affiant, Lieutenant Joseph J. Byrne, of the Baltimore City Police Department, had received a complaint that the appellant, Morris Chernock, was picking up lottery numbers at a tavern at the intersection of Preston and Gay Streets in Baltimore and taking them to 3926 Green Spring Avenue. On June 6, 1952, two officers watched the said tavern. At about 11:30 A.M. they saw the appellant leave the tavern and enter an automobile, bearing Maryland license No. 231-833, listed to Pauline's Specialty Shop, 536 North Gay Street, and hereinafter referred to as appellant's automobile. Appellant drove in a circuitous route to the house at 3926 Green Spring Avenue. He then took from the glove compartment of his automobile a small brown package which he carried into that house. On June 10, 1952, two officers went to the same tavern. At about 11:30 A.M. they saw the appellant enter his automobile. At that time a colored man called to appellant, approached his automobile and produced from his pocket a bundle of conventional lottery slips and handed them to the appellant and later he talked with the appellant who was looking through the lottery slips. The officers followed the appellant's automobile to the house at 3926 Green Spring Avenue. The appellant got out of his automobile and, after acting suspiciously by looking in all directions, hurriedly entered that house carrying a large brown paper bag, partially filled with some unknown contents. On June 11, 1952, at about 11:35 A.M., the appellant was seen to leave the same tavern, drive to the house at 3926 Green Spring Avenue, where he blew his automobile horn. A white woman came out of this house and appellant handed her a brown package which she accepted and she returned to the house. On June 12, 1952, at about 11:40 A.M., the appellant left the same tavern, entered his automobile, drove in a circuitous route to

the house at 3926 Green Spring Avenue, got out of his automobile carrying a package and entered that house. He remained there a few minutes, came out without the package, re-entered his automobile, and drove to the 6300 block of Green Spring Avenue where he parked and waited for about fifteen minutes. An Oldsmobile sedan slowed down and stopped opposite appellant's automobile and then both automobiles drove off at a high rate of speed into Baltimore County. On June 18, 1952, the officers went to the vicinity of the 6300 block of Green Spring Avenue where the two before mentioned automobiles had been seen on June 12th. At about 1:10 P.M. they observed the same Oldsmobile sedan, operated by a man known as Edward Helziner, alias Boston Blackie, crusing in the neighborhood, the driver apparently looking for someone. At about 1:20 P.M. they saw the appellant, operating his automobile, park at the end of the 6300 block of Green Spring Avenue. Helziner walked south on Green Spring Avenue and entered appellant's automobile. Appellant then drove about half a block and parked under a large tree where the two men sat on the front seat. The officers, by looking through binoculars, saw the two men studying conventional lottery slips. The men remained there about five minutes and then drove out of sight. The officers later saw the appellant driving south on Green Spring Avenue. In a few minutes they noticed his automobile being followed by Helziner. The two officers then found appellant's automobile parked in front of 3926 Green Spring Avenue. On July 8, 1952, the officers saw appellant's automobile parked near the above mentioned tavern. At 11:30 A.M. the appellant came out of the tavern, entered his automobile and drove west on Preston Street and south on Central Avenue to the 900 block where he parked at the curb. He remained seated in his automobile for approximately five minutes, apparently studying something held in his hand. In about eight minutes Helziner entered appellant's automobile. They engaged in conversation and in about

three minutes Helzinger got out of appellant's automobile and walked away. The appellant remained in his automobile and drove to 3926 Green Spring Avenue and entered the house. The application further alleged: "The lottery carried on and known as 'numbers' requires that the play or slips be collected by certain people designated as runners and writers and then returned to the person or corporation conducting the game; and it is the belief of the affiant that the persons named, described and referred to herein are runners or writers and are actively engaged in the business of conducting a lottery." The warrant authorized the search of the automobile bearing Maryland license 231-833 and of the premises at 3926 Green Spring Avenue.

In *Fleming v. State,* 201 Md. 145, 92 A. 2d 747, a case very similar to the one before us here, the affidavit for the search warrant stated that the police officers had received a complaint that one Robert E. Stanton was engaged in lottery numbers. On numerous occasions this man was seen, while acting suspiciously, enter a building at 1135 North Monroe Street, Baltimore, carrying a brown paper bag partially filled with unknown contents. On another occasion they saw the same person receive from another man "some yellow looking slips" similar to those used in the operation of a lottery and return to the same premises. When he left those premises he had no bag. This Court, in holding that the allegations in the affidavit constituted probable cause for belief that lottery operations were being carried on at 1135 North Monroe Street, justifying the issuing of the search warrant, stated: "In the case of *Bratburd v. State,* 193 Md. 352, at page 356, 66 A. 2d 792, at page 794, it was said: 'In support of his contention that there was no probable cause shown for the issuance of the search warrant, defendant relies on *Wood v. State,* 185 Md. 280, 44 A. 2d 859. In that case we said: "Probable cause is more than suspicion or possibility but less than certainty or proof. On the facts this case is near the border. The question of

probable cause must be determined by the judge, not by the applicant for the search warrant. * * * But in making this determination, the experience and special knowledge of the police officers who are applicants are among the facts which may be considered." 185 Md. at page 286, 44 A. 2d at page 861.' Probable cause must be determined by the judge who issues the search warrant. Article 27, Section 328, 1951 Code. Facts relied on to show probable cause are sufficient if they are such as to justify a prudent and cautious man in believing that the offense has been committed. *Lucich v. State,* 194 Md. 511, 71 A. 2d 432, 434; *Smith v. State,* 191 Md. 329, 338, 62 A. 2d 287, 5 A. L. R. 2d 386, and cases there cited. The instant case is hardly a borderline case. It is well known that in the 'numbers' game 'runners' are necessary. The actions of the so-called Stanton were certainly similar to those of such a 'runner'. The passage to Stanton of 'yellow looking slips' and his immediate return to the tavern which appeared to be headquarters, together with all the other circumstances alleged in the search warrant, we think showed probable cause, more than suspicion or possibility, that lottery operations were being carried on in this two-story building." Here, as in the *Fleming* case, *supra,* the appellant was seen to enter the house at 3926 Green Spring Avenue with a brown paper bag which, from the cases before us, seems to be standard equipment in lottery operations. Here, as in the *Fleming* case, the appellant was handed a bundle of conventional lottery slips before entering the premises authorized to be searched. Here, as in the *Fleming* case, before entering the premises, the appellant looked around suspiciously. Here, the appellant, with another man, was seen studying conventional lottery slips and later his automobile was parked in front of the premises. We are of opinion that the allegations in the application for the search warrant, based on previous decisions of this Court, showed probable cause and much more than

suspicion or possibility that lottery operations were being carried on at 3926 Green Spring Avenue.

In the execution of the search warrant on July 10, 1952, the officers went to the premises at 3926 Green Spring Avenue with the search warrant. They were admitted to the house by the appellant, who was alone there. In a rear room on the second floor Sergeant Joseph O'Donnell found two clip boards, on one of which there were three slips, some black and blue notebooks and some yellow and white pads. He also found a black notebook containing certain inscriptions which, at first glance, he could not understand. He testified that he had been on the vice squad for eight years and had participated in two hundred lottery cases. On the occasion of this raid he said he studied the markings in the book for about a half hour. He found in the back of the book a slip containing words "United Candy" next to which were the letters "LE EHFH". Upon looking in the telephone directory he found that the telephone number of United Candy was Lexington 3515. By Applying that number of "LE EHFH" he made the following determination that                    LE            EHFH represented                    Lexington     3515. Therefore, letter E represented No. 3; letter H, No. 5; and letter F, No. 1. He studied other names and the letters written after them, such as George Gani        HO   BHAE and he found that this represented                    George Gangi–Hopkins 6573. By studying other slips and grouping the numbers with the accompanying letters while consulting the telephone directory, he discovered the code word "FRESH BACON" representing numbers as follows:

1 2 3 4 5 6 7 8 9 0
F R E S H B A C O N.

When shown the slips at the trial, the officer testified that, by using this code, these slips represented numbers and the amount placed thereon.

Officer Timothy Breslan testified as follows about a conversation with the appellant: "While I was remov-

ing—well at the outset of this conversation I just mentioned, the Lieutenant had mentioned to Mr. Chernock that the Sergeant had broken his code, and he mentioned the word 'FRESH BACON' and then as I was taking a telephone out of the vestibule or the hallway in the front room just below the stairs Mr. Chernock said to me, asked me if there was no key written to a code was it possible to break it and prove that it was a code, and I told him I didn't know." On cross-examination, Sergeant O'Donnell testified that he remained on the premises approximately two hours working on this code. He stated, in response to a question on cross-examination, that he had had no experience with the art of cryptography.

The appellant contends that the trial judge erred in permitting Sergeant O'Donnell to testify that certain groups of letters of the alphabet inscribed on the slips of paper, found on appellant's premises, were lottery numbers and bets thereon because the sergeant was not especially qualified to decipher codes and that by doing so, he usurped the function of the jury and, further, that there was no proof whatever that the letters of the alphabet found on three slips in appellant's home were in cipher code or, if so, what that code was.

In *Nolan v. State*, 157 Md. 332, 146 A. 268, the appellant was indicted and convicted on a gambling charge. In his possession had been found papers with figures, "writing and hierogliphics" which were more or less meaningless to persons unfamiliar with bookmaking. In that case Sergeant Koch testified that for seven years he had been working almost exclusively on bookmaking cases and had handled seventy-five or one hundred cases, and by reason of that experience was familiar with the writings and figures upon papers used by bookmakers. He was able to explain and interpret the meaning of them. An objection was made to the admissibility of Sergeant Koch's testimony, because Sergeant Koch, who made the arrest and seized the papers and memorandum, was allowed to explain to the jury their char-

acter and the use made of them by the appellant in the commission of the offense. This Court, in holding this testimony admissible, stated: "It is shown by the evidence that the meaning of the figures, words, etc., appearing upon the papers and memoranda admitted in evidence, and used by Nolan in the commission of the offense of which he was convicted, were altogether of a technical character and their meaning known only to those familiar with the methods of book-making, and, therefore, it was right and proper that Koch, an expert in matters of book-making, should be allowed to explain their meaning. This was necessary in order to properly place such evidence before the jury for its consideration. *Aetna Indem. Co. v. Waters,* 110 Md. 692; *Williams v. Woods,* 16 Md. 251; *Cecil Bank v. Farmers' Bank,* 22 Md. 155; *Roberts v. Bonaparte,* 73 Md. 199; *Leftwitch v. Royal Ins. Co.,* 91 Md. 612; *Needy v. Middlekauff,* 102 Md. 183; 16 C. J. 746; *Douglass v. State,* 18 Ind. 289; *Badart v. Foulon,* 80 Md. 589." Even if the officer's explanation of the writings be considered an opinion, that opinion is based upon plain and easily understood facts which were clearly explained by the officer to the court and jury and were therefore admissible. *Watts v. State,* 99 Md. 30, 36, 38, 57 A. 542; *Weller v. State,* 150 Md. 278, 282-283, 132 A. 624; *Smith v. State,* 182 Md. 176, 182-183, 32 A. 2d 863. In the case of *State v. Wetherell,* 70 Ver. 274, 40 A. 728, the prisoner was tried for rape. He mailed to the prosecutrix a copy of a magazine in which, as the State's testimony tended to show, certain words and letters in said magazine were marked and dotted by the prisoner for the purpose of influencing the prosecutrix, who testified to having picked out the words and sentences after she received the magazine. The trial court permitted an attorney, whom it found to be an expert on handwriting, to pick out, arrange and construct into sentences the marked and dotted words and letters, and to testify what they meant when read in the order in which they were marked. This decipherment disclosed a communica-

tion expressive of love and an injunction to remember her promise. This testimony was held to be admissible. The court there said: "If the prisoner marked and dotted those words and letters, the communication was as much a letter from him as though he had written the same thing in his own hand; and it was competent to call anyone to make the decipherment, whether expert or not, as much as it would be to read a letter so illegibly written as to be difficult to make out. If the prisoner claimed that the witness did not decipher correctly, he was at liberty to show it." Likewise, here, if the inscriptions on the slips found in appellant's house were not in cipher code and did not represent what Sergeant O'Donnell testified they did represent, the appellant was at liberty to show it. Finding no error, the judgment will be affirmed.

*Judgment affirmed, with costs.*